MATTINGLY, ET UX. *v.* HOPKINS, ET AL.

[No. 148, September Term, 1968.]

*Decided June 4, 1969.*

*Motion for rehearing filed June 13, 1969; denied June 23, 1969.*

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SINGLEY and SMITH, JJ.

*Joseph A. Mattingly* for appellants.

*Leo Bender* and *H. Hughes Spragins,* with whom were *Tomes, Spragins & McDonald* on the brief, for appellees.

FINAN, J., delivered the opinion of the Court.

The Circuit Court for Montgomery County dismissed the appellants' declaration, sounding in tort, as it was of the opinion that the three year statutory period of limitations had run prior to the filing of the suit. We are of the same mind.

In 1951, Joseph A. Mattingly and Marion Mattingly, his wife (appellants), purchased lots 8, 9, 10, and 11 of block 2 in a subdivision known as Hillmeade-Bradley Hills in Montgomery County, Maryland. In 1952, the appellants entered into an oral contract with Page F. Hopkins and Charles J. Maddox (appellees), a civil engineering firm, to resubdivide these lots. Appellees prepared and appellants approved, two plats which resubdivided the entire holdings of the appellants in the Hillmeade subdivision, save for a portion of land under and west of a creek which ran through the property, and which parcel faced on Fallen Oak Drive. In their amended declaration which was in the form of one count, filed October 25, 1967, the appellants (the original declaration was filed October 2, 1964) alleged:

"* * * [T]hat they drew plats of resubdivision and placed them on record and attempted to lay out the lots on the ground by placing markers at the corners of said lots in accordance with the plat of resubdivision which is of record, but they failed to layout the resubdivision of said lands on the plot so as to get the greatest yield of lots from the property and they did further fail in laying out said resubdivision of

lots on the ground to place the corner markers in the proper places as shown on the recorded plat of resubdivision in the office of the Clerk of the Circuit Court for Montgomery County, Maryland, and *as a direct result of this failure to carry out the contract in the manner in which they had agreed to do so and directly because of their error in placing the corner markers in the wrong places,* the plaintiffs, relying on their work, when selling the resubdivided lots to third parties were caused to sell more land to said third parties than they intended to, the plaintiffs intending to sell to said third parties only the amount of land as was shown on the record plat and only the land as located on the record plat rather than the amount of land contained within the corner markers as laid out on the ground, and as a direct result thereof the plaintiffs were damaged in that they suffered a great loss of land * * * and in August, 1963, the Circuit Court for Montgomery County, Maryland rendered a decision wherein the lands that were contained within the bounds of the corner markers as incorrectly placed upon the ground by the said Page F. Hopkins and Charles Joseph Maddox was taken from the plaintiffs and granted to third parties who had purchased land from the plaintiffs, and again in June of 1966, the Circuit Court for Montgomery County, Maryland rendered a decision in a case in which the said Page F. Hopkins and Charles Joseph Maddox had been vouched in, wherein lands that were contained within the bounds of the corner markers as incorrectly placed upon the ground by the said defendants were taken from the plaintiffs and granted to third parties, * * * the said Page F. Hopkins and Charles Joseph Maddox failed to lay out said lots on the subdivision plat so as to get the highest yield of lots and

as a direct result of these errors, the plaintiffs suffered damages in that they sold land at a reduced price because they did not know the said land could give a greater yield of lots and further they did not know that the markers were not properly placed and that the markers designated more land than the plaintiffs intended to convey, and further the plaintiffs were damaged in that they were sued twice because of the defendants' errors. * * *." (Emphasis supplied.)

Damages, including value of lost property, cost of new survey, litigation, etc., in the amount of $25,000 were alleged.

We have quoted directly from the amended declaration as the appellants argue that, although they set forth only one count in their declaration, they have actually stated two causes of action in one count; one based on the misplaced boundary pegs and the other on the misrepresentation as to the yield of lots on Fallen Oak Drive. The latter issue will be reserved for discussion later in this opinion.

A general issue plea and a plea of limitations were filed by the appellees.

Testimony was taken on behalf of the plaintiff-appellants as to the allegations contained in the amended declaration. Mr. Mattingly testified that after the appellees had prepared the resubdivision, the plats were filed in the Land Records of Montgomery County on April 8, and December 30 of 1953. In 1953 he commenced to sell lots and continued to do so until the last sale to Mr. and Mrs. Charles W. Houston in February of 1959. The Mattinglys retained one lot on which they built their own home. In the summer of 1959, while attempting to lay out a tennis court, the appellants found what appeared to be a discrepancy between the plats and the physical markers on the lot upon which their home was built. They called appellee Hopkins and told him of the apparent discrepancy and requested that he recheck the survey. It was not un-

til May or June of 1960 that one of the appellees' teams of surveyors appeared on the premises and proceeded to remove the iron pipes which were found to be incorrectly placed and drove in new iron pipes where they should have been placed originally. In December of 1962, the Houstons filed a suit against the appellants seeking reformation of their deed to include in the conveyance that portion of land between where the old boundary pegs were, to where the new stakes were located. As a result of that suit the Houstons were granted reformation of their deed and the appellants suffered a resulting loss of 1554 square feet of land.

In September, 1964, the owners of the resubdivided lots, lots 9, 10, 11, 12, 13 and 14, brought suit against the appellants which resulted in the further loss to the appellants of 2301.6 square feet of land.

After appellant Joseph A. Mattingly had testified on behalf of the plaintiff-appellants as to the allegations contained in the amended declaration, the lower court entertained motions of the appellees to dismiss the suit on the premise that, as a matter of law, the action was barred by the statute of limitations. After hearing argument the lower court granted appellees' motion and dismissed the proceedings.

Although the testimony of the appellant, Joseph A. Mattingly, presents a complicated set of facts, concerning the concatenation of events, the issue before us is the rather narrow one of when the statute of limitations started to run.

Code, Article 57, § 1 provides that "all *actions* of account, actions of assumpsit, or on the case, * * * *shall be commenced, * * * within three years from the time the cause of action accrued; * * *.*" (Emphasis supplied.)

Like most general rules of law, those pertaining to "limitations" become less than profound when an attempt is made to apply them to specific cases. Much has been written as to when "limitations" should start to run. Some courts have held the cause of action accrues when the defendant commits his wrong, others when the plain-

tiff discovers the wrong, and still others have held that it does not acrue until the maturation of harm. Sometimes the happening of the wrong, the knowledge of it and the maturation of the harm are simultaneous. When this occurs the recognition of the accrual of the cause of action is simple, when these elements happen sequentially it can become complex. Furthermore, there are nuances of difference in the accrual of the cause of action in cases arising out of actions *ex contractu,* as distinguished from actions *ex delicto,* and a further hybridization of actions arising out of professional malpractice and otherwise. An exhaustive discourse on the problems which emerge from the various combinations of events which spell out the accrual of the cause of action, is found in 63 Harv. L. Rev. 1177 (1950) and in 28 Md. L. Rev. 47 (1968). Both articles cite numerous cases and the trend of decisions. In 28 Md. L. Rev. 47, beginning at 61 there is a concise summary of "The Situation in Maryland." See also *Prosser, The Law of Torts* (1964) § 30.

However, we think the most viable articulation of the law, in so far as affording a solution to the case at bar is concerned, is found in *Waldman v. Rohrbaugh,* 241 Md. 137, 215 A. 2d 825 (1966). In *Waldman,* Judge Hammond, now Chief Judge, writing for the Court stated, "* * * There is no doubt that as a general rule limitations against a right or cause of action begin to run from the date of the alleged wrong and not from the time that wrong is discovered by the claimant. *Killen v. Geo. Wash. Cemetery,* 231 Md. 337, 343. * * *." (*Id.* at 139.) Although *Waldman* is a medical malpractice case, the Court discussed various theories regarding the time the cause of action accrues and limitations start to run. In reading *Waldman,* it is quite apparent that in Maryland we have adopted the "discovery rule" in medical malpractice cases, originally laid down in *Hahn v. Claybrook,* 130 Md. 179, 100 A. 83 (1917), but which rule had not been as clearly defined in *Hahn* as it subsequently was in *Waldman.* In *Waldman* the Court stated that the statute of limitations commences to run "* * * from the mo-

ment of discovery, the moment he knows or should know he has a cause of action, within which to sue." (*Id.* at 145.) This Court in *Waldman* also recognized that cases involving the construction of the statute of limitations "* * * in cases not involving malpractice [have] recognized the theory of the continuation of events, only the last of which starts the running of the statute. * * *." (*Id.* at 141.), citing *W., B. & A. Elec. R. R. Co. v. Moss*, 130 Md. 198, 100 A. 86 (1917), and *Vincent v. Palmer*, 179 Md. 365, 19 A. 2d 183 (1941).

We emphasize the reference in *Waldman* to the "continuation of events theory" not because we have any extension of the wrongful act by a "continuation of events" in the case at bar, but because the "continuation of events theory," like the "discovery rule," has departed from the general rule originally recognized, that the statute began to run at the time of the commission of the wrongful act. *Waldman*, also cites *Callahan v. Clemens*, 184 Md. 520, 41 A. 2d 473 (1945), wherein the Court recognized, that where there had been a negligent construction of a stone wall on another's land in 1929, but no realization or discovery of the claimed defects until 1939, that the cause of action accrued in 1939.

We think there is no question but that applying the thrust of the *Waldman* opinion to the facts of the case at bar, the cause of action accrued when Mr. Mattingly discovered the discrepancy in the placing of the iron pipes serving as boundary markers in the ground as compared with their location on the plats. This occurred in the summer of 1959 and in our opinion the statute of limitations commenced to run from that date. Even, arguendo, if we were to adopt as the date that limitations started to run, the date when the appellees caused the misplaced iron pipes to be relocated correctly, which occurred in May or June of 1960, Mr. Mattingly would not thereby be benefited because the action was not filed until October of 1964. We see no basic distinction between the application of the "discovery rule" in a medical malpractice case and in the instant case, which assuming

that engineering is a profession, is in essence a professional malpractice situation. In other jurisdictions there have been cases involving the negligent and wrongful conduct of attorneys and accountants which have been dealt with under the general scope of professional malpractice. See *Fort Myers Seafood Packers, Inc. v. Steptoe & Johnson*, 381 F. 2d 261 (D.C. Cir. 1967) ; *Galloway v. Hood*, 69 Ohio App. 278, 43 N. E. 2d 631 (1941) ; *L.B. Laboratories v. Mitchell*, 244 P. 2d 385 (Cal. 1952).

We think that Judge Northrop in *Southern Maryland Oil Company v. Texas Company*, 203 F. Supp. 449 (D. Md. 1962), gave a correct summation of the meaning of the "discovery rule" in Maryland as promulgated in *Hahn*, when he stated that *Hahn* "* * * held that the running of the statute commenced, not from the date of the first prescription, but from the time when the first trivial injuries were noted." *Id.* at 452. See also *Jackson v. United States*, 182 F. Supp. 907, 911 (D. Md. 1960).

In the case at bar, Mr. Mattingly, who is a practicing member of the Maryland Bar, certainly had strong reason to believe that he had sustained legal harm when he noted the discrepancy between the placement of the iron pipes on the ground and their location on the plats in the summer of 1959 and this was unquestionably confirmed when the appellees correctly replaced the iron pipes in May or June of 1960. We think the mistake caused by the appellees' negligence was discovered at that time or with the exercise of reasonable diligence should have been discovered. He knew that he had made conveyances of property based on the location of the iron pipes on the ground to several individuals during the years 1953 to 1959 and that the error on the ground thus compounded by the adverse conveyance he had made, not only cast a cloud on the title to his own land but those of his grantees, if not in law, then certainly in equity.

The appellant contends that until the Houston case and that of Branson, another grantee, were decided against him, that he had not been damaged and that the statute of limitations does not start to run until the maturation

of damages. This is certainly the law in some jurisdictions. *Fort Myers Seafood Packers v. Steptoe & Johnson,* 381 F. 2d 261 (D.C. Cir. 1967). However, we think that the case at bar clearly comes within the "discovery rule" as established by *Hahn, supra,* and *Waldman, supra.* Both *Hahn* and *Waldman* fall short of bringing this Court within the ambit of those jurisdictions which recognize that limitations commence to run only after the maturation of harm. (Although, in both *Hahn* and *Waldman* there had been substantial injury to the plaintiff at the time of the discovery of the negligence.) However, assuming, without deciding, that in addition to the discovery of negligence, damages must also have accrued to trigger the running of the statute, we are of the opinion that the Mattinglys had sustained damages when Mr. Mattingly discovered the faulty survey; he certainly could have maintained an action to recover expenses incurred due to the erroneous survey in June, 1960.

Also, it is rather incredible to think that, knowing of the erroneous conveyances which he had made predicated on the faulty survey, he could not have persuaded his grantees to accept a reformation of their deeds, with appropriate adjustments on the purchase price. We think that with the exercise of reasonable diligence he should have known where he stood regarding damages within a reasonable time after the discovery of the error.

The appellants further contend that in addition to the cause of action predicated on the negligently performed survey, they also have a cause of action based on the misrepresentation of the appellees regarding the optimum yield of lots, which were restricted due to a drainage easement, which the appellants claim the appellees proposed as being necessary. Appellants contend that at a hearing conducted on the reassessment of their property in late 1961, they obtained information indicating that it was not necessary for them to have reserved part of their property for such an easement and thus they had been wrongfully frustrated from obtaining a greater yield of saleable lots.

The short answer to this contention is that the gravamen of their declaration is the negligently performed survey. They included only one count in their declaration. Maryland Rule 340 c provides that "Separate causes of action shall be contained in separately numbered counts." They counter Rule 340 c with the argument that since no demurrer was filed to the amended declaration they were entitled to proceed on the basis of two causes of actions expressed in one count, citing *Kirchner v. Allied Contractors, Inc.*, 213 Md. 31, 131 A. 2d 251 (1957). This argument may have proven successful if they had actually alleged two causes of action but we are of the opinion, as was the court below, that in essence, only one cause of action, grounded upon the erroneous staking out of the boundary lines, was expressed in their declaration.

Finally, the appellants propose a novel but rather desperate argument, namely, that since the two plats prepared by the appellees were duly recorded in the office of the Clerk of the Circuit Court for Montgomery County this made the plats specialties on which suit could be maintained with an attending twelve year period of limitations.

In support of this construction the appellants cite the case of *Sterling v. Reecher*, 176 Md. 567, 6 A. 2d 237 (1939). In *Sterling*, there was a question concerning the limitations on a suit by a receiver to enforce double liability on the stockholders of a trust company under a statutory procedure. The court in discussing limitations went back to the English statute of limitations on actions, 21 James I, ch. 16 (1624), stating:

> "Since shortly after the enactment of the English statute of limitations on actions, 21 James 1, chapter 16, suits grounded on statutes have been held to be in debt on records of the highest rank, those of acts of Parliament, and hence specialties. *Bacon, Abridgement, Limitation of Action (D)*. 'All instruments under seal, of record, and liabilities imposed by statute are spe-

cialties.' 1 *Wood, Limitation of Actions* (4th Ed.) Sec. 29, * * *." *Id.* at 569.

The appellants construe the reference in *Wood*, to "instruments * * * of record" to apply to any document which is recorded in the office of a clerk of a circuit court of this State, under which category they place the two plats prepared by the appellees and recorded in 1953. They further structure their theory by reliance on Code, Art. 57, § 3, which provides for a 12 year statute of limitations in actions on specialties and accordingly argue, that the 12 year period of limitations had not run against the appellants' cause of action.

There is a paucity of authority on what the term "instruments * * * of record" may mean, in the context of its usage by *Wood*, but we think it is meant to extend to judgments, recognizances, security for costs or a supersedeas and not to every document of contemporary times that happens to be placed on record in the office of a clerk of a court of record.[1]

One must be impressed by the fact that under the general classification of specialties the text writers and cases all speak of specialties as grounded on some type of obligation set forth in the instrument.

Professor Williston affords us little help in this instance as he simply states: "* * * Centuries before the recognition of simple contracts, promises under seal were held binding. They were variously called deeds, specialties, or covenants. * * *." Vol. 1 *Williston on Contracts,* (3rd Ed. Jaeger) § 5.

In Vol. 39A *Words and Phrases* at 385, we find a discussion on specialties which states: "* * * The term has long been used in England and America as embracing debts on recognizances, judgments, and decrees, and in

---

1. Code (1966 Repl. Vol.) Art. 17, § 59 provides for recording of plats with Clerk of the Court, and § 63 requires certification of plat by a registered professional engineer and land surveyor in Montgomery and Prince George's Counties. See also Vol. 1, Montgomery County Code (1965) §§ 17-1 and 17-2 for similar requirements.

England certainly debts upon statute; * * *." Citing *Seymour v. Street,* 5 Neb. 85, 87 (1876).

In some jurisdictions, including Maryland, a judgment is held to be a specialty. Code (1968 Repl. Vol.), Art. 57, § 3, provides that a judgment, a recognizance and a bond are specialties. In *Mattare v. Cunningham,* 148 Md. 309, 316, 129 A. 654 (1925), an award of the State Industrial Accident Commission was declared to be a specialty. See also *Farmers' & Merchants' Bank v. Merryman,* 126 Neb. 684, 254 N. W. 428 (1934); *Stockwell v. Coleman,* 10 Ohio St. 33, 34 (1859); *Randolph v. King,* 20 Fed. Cas. 260, 261 (1867).

We find it illuminating that Chitty in his *Treatise on Pleading,* Vol. 2 (7th London Ed. 1851) lists in his Analytical Table under Declarations in Debt, various categories, i.e., "on simple contracts," "on specialties," "on records," and "on statutes." Under the classification of actions "on records" he includes actions on "recognizances or bail" and "on judgments," (we might note, including Irish Judgments). *Brantly on Contracts,* 2d Ed. (1912), states in Section 47, "All contracts are divided, according to most English writers, into three classes of: 1. Contracts of Record. 2. Contracts Under Seal. 3. Simple Contracts, * * *." In Section 49 he states: *"Contracts of Record.* These are so styled because when made they are matters of record in Courts. A judgment, a recognizance, a security for costs or a supersedeas is a contract of record. * * *." In the next succeeding section, Section 50, he discusses contracts under seal stating: "A contract under seal is also called a *specialty,* because a special contract as opposed to a simple contract, which is one not under seal, whether in writing or not. * * *." (Emphasis in original.)

We also note that in Vol. 49 C.J.S. *Judgments,* § 6, there is a discussion in which the following language is employed, "* * * Judgments have been declared to be contracts, and, likewise, judgments have been declared to be *debts of record,* or *specialties.* * * *." (Emphasis supplied.)

100

In view of the authorities to which we have referred, we think it obvious that *Wood,* when using the language, "all instruments * * *, of record * * * are specialities.", was referring to judgments, recognizances, supersedeas and security for costs and germane instruments and nothing more. We therefore find this final contention of the appellants without merit.

*Judgment affirmed, appellants*
*to pay costs.*