## FRANCES B. HARIG *v.* JOHNS-MANVILLE PRODUCTS CORPORATION

[Misc. No. 1, September Term, 1978.]

*Decided November 21, 1978.*

*John T. Enoch,* with whom were *Goodman, Meagher & Enoch* on the brief, for appellant.

*Robert E. Scott, Jr.,* with whom were *John H. Mudd* and *Semmes, Bowen & Semmes* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

Pursuant to the Uniform Certification of Questions of Law Act, Maryland Code (1974), §§ 12-601 to 12-609 of the Courts and Judicial Proceedings Article, the United States District Court for the District of Maryland has certified for our consideration two questions of law:

> 1. At what time does a plaintiff's cause of action for negligence accrue when plaintiff developed a disease in late 1975 or early 1976, allegedly as a result of exposure during the period 1940-55 to a deleterious substance allegedly occasioned by defendant's negligence?
>
> 2. At what time does a plaintiff's cause of action for strict liability accrue when plaintiff developed a disease in late 1975 or early 1976, allegedly as a result of exposure during the period 1940-55 to a deleterious substance emanating from defendant's products?

For reasons that follow, we hold that a plaintiff's cause of action for latent disease, whether framed in terms of negligence or strict liability, accrues when he discovers, or through the exercise of reasonable care and diligence should have discovered, the nature and cause of his disability or impairment. Our decision in this matter is premised upon an analysis of the rationale underlying the applicable statute of

limitations, considered in conjunction with authoritative case law construing when a cause of action accrues.

Frances Harig, the designated appellant in this proceeding, instituted a civil action in the United States District Court for the District of Maryland on May 23, 1977 against the appellee Johns-Manville Products Corporation (Johns-Manville), alleging that she developed a disease in late 1975 or early 1976 as a result of exposure to the appellee's asbestos products from 1940 through 1955. During the period 1940-55 (except for a short period as a federal employee in Washington, D.C.), Mrs. Harig was employed as a secretary for Reid-Hayden, Inc. (Reid-Hayden), a Baltimore firm engaged in the purchasing, fabrication, sale and installation of asbestos products.

Johns-Manville mines, processes and sells products containing asbestos to independent fabricators who then shape, cut and otherwise create a finished product for their customers' needs. During the period 1940-55, Johns-Manville sold products containing asbestos to Reid-Hayden, which fabricated them into finished products.

Most of these products were fabricated and some were warehoused two stories above the office where Mrs. Harig was employed as a secretary. In addition, Reid-Hayden also warehoused other products containing asbestos in other buildings on its premises.

Mrs. Harig alleged in her complaint that part of her secretarial duties with Reid-Hayden required her to enter areas where employees of the firm were working with products containing asbestos, as well as handling files that had been exposed to asbestos dust. It was during the course of this employment that Mrs. Harig alleges that she was exposed to Johns-Manville's asbestos products. It is alleged that that exposure directly and proximately caused her to develop a malignant mesothelioma, described as a cancer of the pleura and pericardium.

Mrs. Harig left the employ of Reid-Hayden in January of 1955 and since that date has had no known asbestos exposure. At no time during the course of her employment with

Reid-Hayden or subsequent thereto, did Mrs. Harig ever purchase or work directly with any of Johns-Manville's products. After leaving Reid-Hayden, Mrs. Harig was employed by the Western Maryland Railway Co. She retired on June 1, 1977.

Until November, 1975, Mrs. Harig claimed to be in good health. But soon thereafter she developed a cough. In 1976, she was hospitalized on three occasions. On October 27, 1976 her condition was diagnosed as malignant mesothelioma, and she was so advised by her physicians. Mrs. Harig alleges that she did not suffer any consequential damages from her exposure to products containing asbestos until after 1975.

The complaint filed in the District Court consisted of three counts and sought both compensatory and punitive damages. Count I alleged negligence; Count II alleged a breach of warranty; and Count III alleged strict liability due to Johns-Manville's sale of its products in a defective and dangerous condition. Johns-Manville raised the defense that the claim was barred by limitations. On March 2, 1978 the District Court dismissed Count II and the punitive damage claim as to Count III. It concluded, however, that with regard to the applicable statute of limitations "there are involved in this case two questions of law of the State of Maryland, the answers to which may be determinative of this case." Finding that "there are no controlling precedents among the decisions of the Court of Appeals of Maryland as to those questions," the District Court certified the two questions previously set forth concerning the time at which a cause of action accrues in situations involving the latent development of disease.

Code, § 5-101 of the Courts Article provides: "A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period." Mrs. Harig contends that because of the latent nature of her illness, her cause of action, whether framed in terms of traditional negligence concepts or in terms of strict liability, did not accrue until she knew or reasonably should have known of the injury — at the earliest when the cough developed in 1975. She urges that we so construe the statute and thereby apply the "discovery rule," previously

recognized in Maryland, but heretofore limited to cases of professional malpractice.[1] *See, e.g., Watson v. Dorsey,* 265 Md. 509, 290 A. 2d 530 (1972); *Leonhart v. Atkinson,* 265 Md. 219, 289 A. 2d 1 (1972); *Steelworkers Holding Co. v. Menefee,* 255 Md. 440, 258 A. 2d 177 (1969); *Feldman v. Granger,* 255 Md. 288, 257 A. 2d 421 (1969); *Mumford v. Staton, Whaley & Price,* 254 Md. 697, 255 A. 2d 359 (1969); *Mattingly v. Hopkins,* 254 Md. 88, 253 A. 2d 904 (1969); *Waldman v. Rohrbaugh,* 241 Md. 137, 215 A. 2d 825 (1966); *Hahn v. Claybrook,* 130 Md. 179, 100 A. 83 (1917). In the alternative, Mrs. Harig argues that her cause of action did not accrue until she suffered consequential damages because, until that time, she could not have maintained either her negligence or strict liability action to a successful result.

Johns-Manville contends that the statute of limitations began to run, at the latest, when Mrs. Harig was last exposed to its asbestos products. It characterizes Mrs. Harig's latent disease as "[l]ater injurious developments . . . merely elements of damage . . . not in and of themselves individual causes of action." Under this construction, Mrs. Harig's cause of action would have been time-barred three years after she left Reid-Hayden.

## I

In a case in which limitations is an issue, it is necessary to ascertain the date from which the cause of action accrues. The certified questions involve the determination of when a cause of action accrues in situations in which the occurrence of a wrong (exposure to a deleterious substance) and the subsequent development and discovery of a latent disease are not contemporaneous. Judge Finan, speaking for the Court in *Mattingly v. Hopkins,* 254 Md. 88, 92-93, 253 A. 2d 904

---

1. Johns-Manville has characterized this construction of the statute as the "maturation of harm" rule, a rule which we have refused to adopt. *See, e.g.,* Watson v. Dorsey, 265 Md. 509, 512, 290 A. 2d 530 (1972). But, as we hereafter point out, our decision in this matter is consistent with those cases refusing to adopt the "maturation of harm" rule, because the present case involves the complete ignorance of any actionable injury as distinguished from simple ignorance of the extent of injury.

(1969), underscored the complexities of such issues in these words:

"Like most general rules of law, those pertaining to 'limitations' become less than profound when an attempt is made to apply them to specific cases. Much has been written as to when 'limitations' should start to run. Some courts have held the cause of action accrues when the defendant commits his wrong, others when the plaintiff discovers the wrong, and still others have held that it does not accrue until the maturation of harm. Sometimes the happening of the wrong, the knowledge of it and the maturation of the harm are simultaneous. When this occurs the recognition of the accrual of the cause of action is simple, when these elements happen sequentially it can become complex. Furthermore, there are nuances of difference in the accrual of the cause of action in cases arising out of actions *ex contractu,* as distinguished from actions *ex delicto,* and a further hybridization of actions arising out of professional malpractice and otherwise."

While § 5-101 mandates when suit on a civil action at law is foreclosed, it does not define the word "accrues" and thus does not indicate when the three-year time period is triggered. Absent such statutory definition, the question of when a cause of action accrues is left to judicial determination. *Raymond v. Eli Lilly & Co.,* 117 N. H. 164, 371 A. 2d 170, 172 (1977); *Berry v. Branner,* 245 Or. 307, 421 P. 2d 996, 999 (1966); *Jones v. Sugar,* 18 Md. App. 99, 105, 305 A. 2d 219 (1973). *See* 1 H. Wood, *Limitation of Actions,* 685, 686 (4th ed. 1916); *Developments in the Law — Statutes of Limitations,* 63 Harv. L. Rev. 1177, 1203-1205 (1950) [hereinafter cited as *Developments in the Law*]. The determination is properly made with reference to the rationale underlying statutes of limitations. These purposes include encouraging promptness in instituting actions, suppressing stale or fraudulent claims, and avoiding inconvenience which may stem from delay when it is practicable to assert rights. *Morgan v. Grace Hospital,*

*Inc.,* 149 W. Va. 783, 144 S.E.2d 156, 161 (1965). The chief consideration is fairness to the defendant — providing assurance that no ancient obligations remain, and relieving him of defending against a claim after "evidence has been lost, memories have faded, and witnesses have disappeared." *Order of R.R. Telegraphers v. Railway Express Agency,* 321 U. S. 342, 349, 64 S. Ct. 582, 88 L. Ed. 788 (1944). *See also* Callahan, *Statutes of Limitations—Background,* 16 Ohio St. L.J. 130 (1955). Our own cases emphasize that the adoption of statutes of limitations reflect a policy decision regarding what constitutes an "adequate period of time" for "a person of ordinary diligence" to pursue his claim. *Walko Corp. v. Burger Chef Systems, Inc.,* 281 Md. 207, 215, 378 A. 2d 1100 (1977); *McMahan v. Dorchester Fertilizer Co.,* 184 Md. 155, 159, 40 A. 2d 313 (1944).

In Maryland, the general rule is that limitations against a right or cause of action begin to run from the date of the alleged wrong and not from the time the wrong is discovered. *Killen v. Geo. Wash. Cemetery,* 231 Md. 337, 190 A. 2d 247 (1963). The legislature has promulgated exceptions to this general rule. *See, e.g.,* Code (1974) §§ 5-102 (c), 5-104 (b), 5-201, 5-203 of the Courts Article. None of these exceptions is applicable to the present case. Our predecessors have recognized two other departures from the general rule: the continuation of events theory and the discovery rule. *Compare Vincent v. Palmer,* 179 Md. 365, 19 A. 2d 183 (1941) *and W., B. & A. Elec. R.R. Co. v. Moss,* 130 Md. 198, 100 A. 86 (1917) (adopting the continuation of events theory) *with Hahn v. Claybrook,* 130 Md. 179, 100 A. 83 (1917) (applying the discovery rule to a medical malpractice claim). Only the latter exception concerns us here.

Ordinarily, a potential tort plaintiff is immediately aware that he has been wronged. He therefore is put on notice that the statute of limitations begins to run from the date of the alleged wrong. *R. J. Reynolds Tobacco Co. v. Hudson,* 314 F. 2d 776, 781-782 (5th Cir. 1963). Our predecessors recognized, however, that in professional malpractice cases, the fact that a tort has been committed may go unnoticed for years, because the plaintiff is unqualified to ascertain the initial

wrong and could not reasonably be expected to know of the tort until actual injury is experienced. *Waldman v. Rohrbaugh,* 241 Md. 137, 215 A. 2d 825 (1966). The inherently unknowable character of this type of cause of action, coupled with the peculiarly harsh consequences of adherence to the general rule of accrual from the date of the "wrong," prompted our predecessors to recognize the discovery principle in determining when a cause of action accrues for latent injury resulting from professional malpractice.

Other jurisdictions have applied the discovery rule, in various factual situations, for similar or analogous reasons. One such theory is that a cause of action simply cannot exist until there has been an injury or consequential damage which is discoverable by a reasonably prudent plaintiff. *Ayers v. Morgan,* 397 Pa. 282, 154 A. 2d 788, 792 (1959). Other courts simply emphasize that a contrary result does violence to the purpose of statutes of limitation, because a plaintiff who could not have known of his cause of action cannot be accused of slumbering on his rights. *E.g., Urie v. Thompson,* 337 U. S. 163, 170, 69 S. Ct. 1018, 93 L. Ed. 1282 (1949); *Raymond v. Eli Lilly & Co.,* 117 N. H. 164, 371 A. 2d 170, 173-74 (1977); *Berry v. Branner,* 245 Or. 307, 421 P. 2d 996, 998-99 (1966). In this regard, one commentator has stated that "[a]s between the duly diligent plaintiff and the wrongdoer, the courts have been unnecessarily sympathetic towards the latter, in shortening the period in which it is likely that the plaintiff will bring an action or in entirely depriving the plaintiff of a practical remedy." *Developments in the Law,* 63 Harv. L. Rev. at 1205. Those courts applying the discovery rule consider any unfairness to the defendant as either outweighed by, or at least to be measured against, the unfairness of depriving a reasonably prudent plaintiff of an opportunity to present his claim. *Raymond v. Eli Lilly & Co.,* 117 N. H. 164, 371 A. 2d 170, 176-77 (1977); *Lopez v. Swyer,* 62 N. J. 267, 300 A. 2d 563, 567 (1973).[2]

---

2. The New Jersey court suggested that determinative factors in the balance may include the nature of the alleged injury, the availability of witnesses and written evidence, the time lapse since the alleged wrongdoing, whether the delay was to any extent deliberate, and whether it unusually prejudiced the defendant. Lopez v. Swyer, *supra.*

Maryland first recognized the discovery rule in *Hahn v. Claybrook,* 130 Md. 179, 100 A. 83 (1917), a medical malpractice case. Although the plaintiff's recovery in *Hahn* was barred by the limitations statute, because she had, in fact, discovered her injury more than three years prior to the filing of suit, the Court enunciated the rule as follows:

> "The ground of the cause of action in this case, was the discoloration of the plaintiff's skin by the use of the drug called argentum oxide, and the statute began to run from the time of the discovery of the alleged injury therefrom." *Id.* at 187.

The *Hahn* decision formed the basis for subsequent application of the discovery rule to an action for negligent design and construction of a wall. *Callahan v. Clemens,* 184 Md. 520, 41 A. 2d 473 (1945). In that case, we recognized that where there had been a negligent construction of a stone wall on another's land in 1929, but no realization or discovery of the claimed defects until 1939, the cause of action accrued in 1939.

The discovery rule received its most comprehensive articulation in *Waldman v. Rohrbaugh,* 241 Md. 137, 215 A. 2d 825 (1966). Analyzing *Hahn* and authorities from other jurisdictions, the Court expressly adopted the discovery rule in medical malpractice actions, holding that the right of action for malpractice accrues when the patient knows or should know that he has suffered injury or damage. In so holding, it was noted that the unreasonable and inequitable consequences of a contrary rule, leaving blameless victims without a remedy in various classes of cases, had led many courts and some legislatures to adopt the discovery rule in one form or another.

In the period from 1969 to 1972, we extended the applicability of the discovery rule to all cases of professional malpractice. In *Mattingly v. Hopkins,* 254 Md. 88, 253 A. 2d 904 (1969), involving an action against a civil engineering firm to recover damages for alleged breach of contract and misrepresentation, we said at 94-95:

> "We see no basic distinction between the application

> of the 'discovery rule' in a medical malpractice case and in the instant case, which assuming that engineering is a profession, is in essence a professional malpractice situation."

Similarly, in *Mumford v. Staton, Whaley & Price,* 254 Md. 697, 255 A. 2d 359 (1969), a case involving a claim of professional malpractice against an attorney, we refused to make "favored litigants of attorneys by applying a less stringent rule to members of the legal profession than to doctors or surveyors." *Id.* at 714. The Court stated that "limitations should be applied in the same manner to all suits for professional malpractice . . . ." *Id.*

Subsequently, we recognized the applicability of the discovery rule to cases of accounting malpractice, *Leonhardt v. Atkinson,* 265 Md. 219, 289 A. 2d 1 (1972); *Feldman v. Granger,* 255 Md. 288, 257 A. 2d 421 (1969), and reiterated its applicability to architectural, *Steelworkers Holding Co. v. Menefee,* 255 Md. 440, 258 A. 2d 277 (1969), and legal malpractice, *Watson v. Dorsey,* 265 Md. 509, 290 A. 2d 530 (1972).

In our judgment, the critical factor, which precipitated our adoption of the discovery rule in the professional malpractice cases, is equally present in the instant case. We noted in a professional malpractice case against an accounting firm that the rule "gives to the individual exercising reasonable diligence the full benefit of the statutory period in which to file suit, while at the same time protecting the defendant from 'stale claims,' as was intended by the statute." *Feldman v. Granger, supra,* 255 Md. at 297. The same rationale calls for application of the discovery rule in cases of latent disease.[3]

---

3. Johns-Manville argues that the discovery rule, as applied to professional malpractice, should not be extended to cases of latent disease, buttressing its argument with the following dictum contained in a footnote in Atwell v. Retail Credit Co., 431 F. 2d 1008 (4th Cir. 1970):

"The exception for professional malpractice cannot fairly be described as a possible opening wedge to a general change in the Maryland rule; it is an exception of long standing, having been applied as early as 1917. The reasons for Maryland's application of the 'discovery of the wrong' rule in professional malpractice cases — the relation of trust, reliance on professional expertise, and the likelihood that injury will not occur simultaneously with

If the construction of § 5-101 urged upon us by Johns-Manville were adopted, "a person of ordinary diligence" would have an "[in]adequate period of time" to pursue his claim. *Walko Corp. v. Burger Chef Systems, Inc.,* 281 Md. at 215. Like the victim of undiscoverable malpractice a person incurring disease years after exposure cannot have known of the existence of the tort until some injury manifests itself. In neither case can the tort victim be charged with slumbering on his rights, for there was no notice of the existence of a cause of action. This feature distinguishes these situations from ordinary tort cases, which require no exception to the general rule that knowledge of the wrong is immaterial, because usually some harm will be apparent to a reasonably diligent plaintiff. *Developments in the Law,* 63 Harv. L. Rev. at 1203. *Compare Reynolds Tobacco Co. v. Hudson,* 314 F. 2d 776, 781-82 (5th Cir. 1963) *and Ayers v. Morgan,* 397 Pa. 282, 154 A. 2d 788, 792 (1959) *with* 35 Tenn. L. Rev. 335, 339 (1968). In cases where the initial injury is inherently unknowable, however, the statute of limitations should not begin to run until the plaintiff should reasonably learn of the cause of action. *Developments in the Law,* 63 Harv. L. Rev. at 1207. Avoiding possible injustice in such cases outweighs the desire for repose and administrative expediency, which are the primary underpinnings of the limitations statute. *Id.* at 1204; Birnbaum, *"First Breath's" Last Gasp: The Discovery Rule in.Products Liability Cases,* 13 FORUM 279, 290 (1977).

In construing statutes of limitation worded similarly to § 5-101 of the Courts Article, the clearly discernible trend of recent decisions in state and federal courts favors application of the discovery rule in latent disease cases. *Reynolds Tobacco Co. v. Hudson,* 314 F. 2d 776, 785 (5th Cir. 1963);

---

the wrongful act or omission — are all peculiarly related to the nature of professional conduct." *Id.* at 1010 (fn. 1).

While the three factors outlined in *Atwell* may be present in the professional malpractice cases, we have never adopted such a tri-partite formulation. The critical factor in the instant case is the inherently unknowable character of the cause of action. Just as in the professional malpractice cases, however, our decision in this matter does not signal "a general change in the Maryland rule."

*Chrischilles v. Griswold,* 260 Iowa 453, 150 N.W.2d 94, 100 (1967). *See* Birnbaum, *"First Breath's" Last Gasp: The Discovery Rule in Products Liability Cases,* 13 FORUM 279, 282, 285; Phillips, *An Analysis of Proposed Reform of Products Liability Statutes of Limitations,* 56 N.C.L. Rev. 663, 664 (1978); 4 Am. Jur. *Trials* § 35 (1966); *Products Liability—Accrual and Limitations of Actions,* 35 Tenn. L. Rev. 335, 340 (1968). Moreover, recognition of the discovery principle in these types of cases has gained favor in the commentaries. *See, e.g.,* Annot., 11 A.L.R.2d 277, 295 (1950); Birnbaum, *"First Breath's" Last Gasp: The Discovery Rule in Products Liability Cases,* 13 FORUM 279, 282 (1977); *Developments in the Law,* 63 Harv. L. Rev. at 1204-05; 34 Tex. L. Rev. 480, 482 (1956).

The first application of the discovery rule to a latent disease case was the Supreme Court's decision in *Urie v. Thompson,* 337 U. S. 163, 69 S. Ct. 1018, 93 L. Ed. 1282 (1949), which involved interpretation of when a cause of action accrues within the meaning of the Federal Employers' Liability Act. In *Urie,* the Court focused on the unreasonableness and inequity of interpreting accrual as of the date of last exposure to an "inherently unknowable harm." The Court recognized that such an interpretation would mean that the federal compensation scheme provided a delusive remedy, because the victim's "failure to diagnose within the applicable statute of limitations a disease whose symptoms had not yet obtruded on his consciousness would constitute waiver of his right to compensation at the ultimate day of discovery and disability." *Id.* at 169. Pointing out that Urie's disease resulted from exposure over a period of time rather than at a point of time, the Court concluded: "We do not think the humane legislative plan intended such consequences to attach to blameless ignorance. Nor do we think those consequences can be reconciled with the traditional purposes of statutes of limitations, which conventionally require the assertion of claims within a specified period of time after notice of the invasion of legal rights." *Id.* at 170.

A number of subsequent decisions, citing *Urie,* have recognized the discovery rule's application to cases involving

latent disease. The Second Circuit, construing Connecticut law, reached this conclusion on the basis that a contrary result would be unreasonable and would nullify *any* right to recover for many latent and insidious diseases. *Ricciuti v. Voltarc Tubes, Inc.,* 277 F. 2d 809, 813 (2d Cir. 1960). *Accord, Brush Beryllium Co. v. Meckley,* 284 F. 2d 797, 798-800 (6th Cir. 1960); *Sylvania Elec. Products, Inc. v. Barker,* 228 F. 2d 842, 847-48 (1st Cir. 1955), *cert. denied,* 350 U. S. 988 (1956); *City of Miami v. Brooks,* 70 So. 2d 306, 308-09 (Fla. 1954).

The similarities between unknown professional malpractice and latent disease cases underlie a number of recent decisions recognizing the discovery rule in the latter type case. The Fifth Circuit explicitly recognized the analogy between the discovery rule applied in medical malpractice cases and court decisions holding that a cause of action for injuries from exposure to deleterious substances over a period of time does not accrue until the effects are manifest. *Borel v. Fibreboard Paper Products Corp.,* 493 F. 2d 1076, 1102 (5th Cir. 1973), *cert. denied,* 419 U. S. 869 (1974). In a well-reasoned opinion, the Supreme Court of New Hampshire reviewed authorities applying the discovery rule to products liability cases, and applied the rule, then recognized in medical malpractice situations, to a suit against a drug manufacturer for latent side effects. *Raymond v. Eli Lilly & Co.,* 117 N. H. 164, 371 A. 2d 170, 177 (1977). Similarly, Texas law has been construed to apply the discovery rule to such a cause of action, based on the same rationale that supports its application to malpractice cases. *Thrift v. Tenneco Chemicals, Inc.,* 381 F. Supp. 543, 545-46 (N.D. Tex. 1974). *See also Wigginton v. Reichold Chemicals, Inc.,* 133 Ill. App. 2d 776, 274 N.E.2d 118, 121 (1971). *But cf. Johns-Manville Products Corp. v. Louisville Trust Co.,* PROD. LIAB. REP. (CCH) ¶ 7956 (Ky. App. 1977) (intermediate court refused to extend malpractice discovery rule to latent disease case).

The Supreme Court of New Jersey has given broad application to the discovery rule "whenever equity and justice" demand, concluding that each case requires a balancing of the parties' competing equities. *Lopez v. Swyer,* 62 N. J. 267, 300 A. 2d 563, 566-67 (1973). A number of other

courts appear to have adopted a broad view of the discovery principle's applicability. *See, e.g., Grigsby v. Sterling Drug, Inc.,* 428 F. Supp. 242, 243 (D.C.C. 1975), *aff'd without opinion,* 543 F. 2d 417 (D.C. Cir. 1976); *McCroskey v. Bryant Air Conditioning,* 524 S.W.2d 487, 490-91 (Tenn. 1975); *G. D. Searle & Co. v. Superior Court,* 122 Cal. Rptr. 218, 220, 49 Cal. App. 3d 22 (Ct. App. 1975); *Neilson v. Arizona Title Ins. & Tr. Co.,* 15 Ariz. App. 29, 485 P. 2d 853, 854 (1971). *See also Romano v. Westinghouse Elec. Co.,* 114 R. I. 451, 336 A. 2d 555, 560-61 (1975); *Chrischilles v. Griswold,* 260 Iowa 453, 150 N.W.2d 94, 100 (1967). *But cf. Gates Rubber Co. v. USM Corp.,* 508 F. 2d 603, 614-15 (7th Cir. 1975) (refusing to read Illinois cases to apply discovery rule to property damage action in commercial setting).

It is thus clear that authorities from other jurisdictions recognize the applicability of the discovery rule in contexts other than professional malpractice. We think our earlier decisions applying the discovery rule to professional malpractice actions are properly to be extended to cases involving, as here, latent disease. Both classes of tort plaintiffs may, in appropriate circumstances, be "blamelessly ignorant" of the fact that a tort has occurred and thus, ought not be charged with slumbering on rights they were unable to ascertain. Therefore, in situations involving the latent development of disease, a plaintiff's cause of action accrues when he ascertains, or through the exercise of reasonable care and diligence should have ascertained, the nature and cause of his injury.

## II

We think Mrs. Harig's strict liability action should be treated the same under § 5-101 as her negligence action.

In *Phipps v. General Motors Corp.,* 278 Md. 337, 363 A. 2d 955 (1976), we stated that "[a]n action under the theory of strict liability . . . [is] governed by the general tort limitations period . . . which is three years but may begin to run at a later time." *Id.* at 350. Implicit in this statement is our recognition that the theory of strict liability does not mark a "radical

84

departure" from established tort concepts. Rather, "the major distinction between an action in strict liability in tort and one founded on traditional negligence theory relates to the proof which must be presented by the plaintiff." *Id.* at 350-51. Bearing this distinction in mind, the limitations statute presumably serves the same purposes and is premised upon the same rationale whether an action is framed in negligence or strict liability. Hence, the statute ought to be applied consistently. Consequently, our holding today with regard to the discovery doctrine in latent disease cases, applies to a strict liability action to the same extent it applies to an action sounding in negligence. *See* Burch, *A Practitioner's Guide to the Statute of Limitations in Product Liability Suits,* 5 U. Balt. L. Rev. 23, 39 (1975).

*Questions of law answered as herein set forth; costs to abide the result.*