SISTERS OF MERCY OF THE UNION IN THE UNITED STATES OF AMERICA ET AL. *v.* GAUDREAU, INC.

[No. 334, September Term, 1980.]

*Decided December 12, 1980.*

The cause was argued before GILBERT, C. J., and MELVIN and WILNER, JJ.

*Thomas N. Biddison, Jr.,* for appellants.

*William M. Nickerson* for appellee.

GILBERT, C. J., delivered the opinion of the Court.

## — PREFACE —

The difference between negligence and malpractice is the matter of a degree. If an individual, through carelessness or disregard, commits or omits to perform a certain act or duty upon, or directed towards another, he is said to be negligent. When the negligence arises out of a relationship between a layman and a professional and is directly attributable to the professional care, treatment, advice, representation, services, or conduct, negligence is by verbal alchemy transmuted into malpractice.

## — THE INSTANT CASE —

The instant case is between Sisters of Mercy of the Union in the United States of America and Mercy Villa, Inc. (hereinafter referred to as "the Sisters") and Gaudreau, Inc., (Gaudreau), a firm of architects.

From the record it is apparent that the Sisters were desirous of constructing a retirement home for the Sisters of Mercy. Sister Mary Faith McKean, the Provincial Administrator of the Order contacted Gaudreau in early 1972 for the purpose of obtaining Gaudreau's services in the planning, designing, and construction of the retirement

home. Bellona Avenue, in the Baltimore Metropolitan area, was chosen as the site for the home, Mercy Villa, Inc.

A contract between the parties was signed on May 1, 1972. Gaudreau designed the building and selected the materials that were used. Lawrence Construction Company was engaged to build the Villa.

Construction was completed in June 1974, and the Sisters moved into the building. Defects in the building were observed both before and after occupancy. Included among those defects were "leaking water causing multiple problems such as stained carpet and discolored tiles." Additionally, there "were structural cracks, faulty ventilation, heating and insulation, and ill-fitting doors and windows." Notwithstanding that the discrepancies were called to Gaudreau's attention, "[m]any of them remained uncorrected well into 1975." The water leakage was first noticed in 1974. The Sisters aver that they were not aware of either the source of the leak or the responsibility for it. Repeated attempts by the roofing contractor to fix the leak were unsuccessful. Finally, in April 1979, the Sisters sought legal assistance. Their counsel engaged the services of an independent estimator who specialized in construction and fire loss appraisals. Another architect was also employed. Those two persons reported to the Sisters' lawyer that the leakage problems "were to a great extent attributable to a faulty design" by Gaudreau.

After attempts to negotiate with Gaudreau failed to produce results satisfactory to the Sisters, they, pursuant to a clause in the agreement of May 1, 1972, between Gaudreau and themselves, sought to compel arbitration. The part of the agreement upon which the Sisters relied provides:

*"ARTICLE 11*

ARBITRATION

11.1 All claims, disputes and other matters in question arising out of, or relating to, this Agreement or the breach thereof shall be decided by arbitration in accordance with the Construction Industry

Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise. This agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law.

11.2 Notice of the demand for arbitration shall be filed in writing with the other party to this Agreement and with the American Arbitration Association. *The demand shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations.*

11.3 The award rendered by the arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof." (Emphasis supplied.)

Gaudreau responded by filing a petition in the Circuit Court of Baltimore City in which it asserted that the Statute of Limitations had run, and that as a result, the arbitration should be stayed. Apparently to bolster their chance at arbitration, the Sisters filed a cross-petition in which they sought to compel Gaudreau to submit the claim to the American Arbitration Association.

On December 18, 1979, a hearing was held before Judge Joseph H. H. Kaplan, who denied the Sisters' petition to compel arbitration and granted, on the basis of the Statute of Limitations, Gaudreau's request for a stay of arbitration.

## — THE PROBLEM —

Unwilling or unable to drink "the lees of defeat," [1] the Sisters have appealed to this Court where they posit to us that:

---

1. The "lees" of wine are the bitter dregs that settle to the bottom of the vat. Thus, "lees of defeat" would be loosely the bitter taste of defeat. *See Morris Dictionary of Word and Phrase Origins* (Harper & Row, 1977).

"The Lower Court Erred in Holding That the Statute of Limitations in Professional Malpractice Cases Begins to Run Upon the Noting of the First Trivial Injury, Whether or Not the Cause of That Injury Was Known.

 . . . .

A. The Statute of Limitations in professional malpractice cases cannot be tolled before the victim is aware of the cause of his injury.

B. The Sisters did not know, nor could they be reasonably expected to know, of the cause of the water damage."

We see the issue before us as simply: Is this action barred by the Statute of Limitations? Patently, if the statute is applicable to the controversy, it is at an end. On the other hand, if the statute does not apply, the Sisters will be able to pursue redress through arbitration.

## — THE LAW —

The general Statute of Limitations in tort actions is found in Md. Cts. & Jud. Proc. Code Ann. (1980 Repl. Vol.) § 5-101.

"A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced."

The statute governs malpractice cases. *McClees v. Cohen,* 158 Md. 60, 148 A. 124 (1930). The statute is plainly worded and easy to apply once it is ascertained when the cause of action accrued. *Levin v. Friedman,* 271 Md. 438, 317 A.2d 831 (1974).

The difficulty that arises with respect to the statute is in determining just when a particular action accrued so as to trigger the statute.

The late Judge Thomas B. Finan, writing for the Court in *Mattingly v. Hopkins,* 254 Md. 88, 92-93, 253 A.2d 904, 907

(1969), said of the then Md. Ann. Code art. 57, § 1 (the predecessor of Courts Art. § 5-101):

> "Like most general rules of law, those pertaining to 'limitations' become less than profound when an attempt is made to apply them to specific cases. Much has been written as to when 'limitations' should start to run. Some courts have held the cause of action accrues when the defendant commits his wrong, others when the plaintiff discovers the wrong, and still others have held that it does not accrue until the maturation of harm. Sometimes the happening of the wrong, the knowledge of it and the maturation of the harm are simultaneous. When this occurs the recognition of the accrual of the cause of action is simple, when these elements happen sequentially it can become complex. Furthermore, there are nuances of difference in the accrual of the cause of action in cases arising out of actions *ex contractu,* as distinguished from actions *ex delicto,* and a further hybridization of actions arising out of professional malpractice and otherwise. An exhaustive discourse on the problems which emerge from the various combinations of events which spell out the accrual of the cause of action, is found in 63 Harv. L. Rev. 1177 (1950) and in 28 Md. L. Rev. 47 (1968). Both articles cite numerous cases and the trend of decisions. In 28 Md. L. Rev. 47, beginning at 61 there is a concise summary of 'The Situation in Maryland.' *See also Prosser, The Law of Torts* (1964) § 30."

*See also Steelworkers Holding Co. v. Menefee,* 255 Md. 440, 443, 258 A.2d 177, 178-79 (1969).

Cognizant of the fact that in some cases it would be grossly unfair to adopt an interpretation of the statute that would require its application accruing from the date of the breach of duty, the Court announced the "discovery rule." *Hahn v. Claybrook,* 130 Md. 179, 180-81, 100 A. 83, 84 (1917). *See Harig v. Johns-Manville Products,* 284 Md. 70, 394 A.2d 299

(1978); *American Home Assurance Co. v. Osbourn,* No. 22 (C.S.A., filed November 7, 1980). That rule applies to claims of medical malpractice. *See Jones v. Sugar,* 18 Md. App. 99, 102-03, 305 A.2d 219, 221-22 (1973).

With respect to malpractice cases, the Statute of Limitations may be likened to a time bomb, lying dormant. When a claimant discovers or should have, with due diligence, discovered that he or she has a cause of action against a wrongdoer for breach of duty, at that moment the detonating device is triggered, and the statute begins to tick away. If the action is not brought within three years of the moment of discovery, or the moment the cause of action should have been discovered, whichever is the earlier, the "bomb" explodes, and the claim is blown to oblivion.

At one time the "discovery rule" was limited in its scope to medical malpractice. *Steelworkers Holding Co. v. Menefee, supra* at 443, 258 A.2d at 179; *Hahn v. Claybrook, supra; Waldman v. Rohrbaugh,* 241 Md. 137, 215 A.2d 825 (1966). As other types of professional malpractice cases arose, the rule was expanded to include accountants, *Feldman v. Granger,* 255 Md. 288, 257 A.2d 421 (1969); attorneys, *Mumford v. Staton, Whaley & Price,* 254 Md. 697, 255 A.2d 359 (1969); civil engineers, *Mattingly v. Hopkins, supra;* architects, *Steelworkers Holding Co. v. Menefee, supra.* Indeed, if we judge the future by the past, as Patrick Henry (1736-1799) suggested in his famous "Liberty or Death Speech" to the Virginia Convention in Richmond on March 23, 1775, there is reason to believe that the "discovery rule" will be applied to all cases of professional malpractice. *Limitations in Professional Malpractice Actions,* 28 Md. L. Rev. 47, 63 (1968).

It is apparent from the record that the Sisters first became aware of the leakage through the "roof and walls" as early as 1974. With Jobian [2] patience, they tolerated the leakage for a period of five years before they were finally motivated to seek the advice of an attorney. The attorney, as we have previously observed, employed a building inspector and an

---

2. The *Bible, Book of Job.*

architect. After their report to the Sisters' attorney, the Sisters opted to sue, explaining that they "had no idea whatsoever as to why . . . [the leakage occurred nor whom] to blame."

We do not doubt that what the Sisters say is true. Nevertheless, they knew that there was leakage and that it was a recurring thing. In our view and that of Judge Kaplan, they knew or should have known that the roof should not have leaked whenever it rained. They knew or should have known that the roof is supposed to protect the inhabitants from the elements, including rain. By the exercise of reasonable diligence, they could have ascertained the cause and the responsibility long before they did so and long before the Statute of Limitations had run its course. That they slept on their rights until the opportunity to bring a suit for breach of duty had expired is of their own doing.

We think the words of Judge Singley in *Steelworkers Holding Co. v. Menefee, supra* at 443-44, 258 A.2d at 179, are particularly applicable here. With slight modification, we adopt those words as dispositive of this matter:

> "We have no hesitancy in saying that the same [discovery rule that is applied to medical doctors, lawyers, civil engineers and accountants] could be availed of in the case before us by [Gaudreau], an architect."

Judge Kaplan correctly held the action to be barred by the Statute of Limitations.

> *Order granting stay of arbitration affirmed.*
> *Costs to be paid by appellants.*