115 P.3d 713

**Alfred S. HAYWARD, Personal Representative of the Estate of Delbert Lewis Hayward, deceased, Plaintiff–Appellant,**

v.

**JACK'S PHARMACY INCORPORATED; Jack Botts; Chad Brown; Herrold E. Park and Richard K. Thurston, M.D., Co–Personal Representatives of the Estate of W. Dyce Thurston, M.D., Defendants–Respondents,**

and

**Valley Vista Care Corporation, a non-profit corporation, d/b/a Valley Vista Care Center, Scott F. Burpee, Jan Burpee and Nancy Renfrew, Defendants.**

No. 30455.

Supreme Court of Idaho, Boise, April 2005 Term.

June 15, 2005.

Cody Law Office, Coeur d'Alene, and Eymann, Allison, Fennessey, Hunter & Jones, P.S., Spokane, Washington, for appellant. Debra L. Stephens argued.

Paine, Hamblen, Coffin, Brooke & Miller, Coeur d'Alene, for respondents Jack's Pharmacy, Inc., Chad Brown and Jack Botts. Eugene L. Miller argued.

Andrew C. Smythe, Spokane, Washington, argued for Respondent Thurston.

JONES, Justice.

Appellant Alfred Hayward appeals the district court's order of summary judgment, in which the court ruled that his experts did not establish the requisite standards of care to proceed with his professional malpractice claims against his deceased father's physician and pharmacists. We vacate the order and remand the case for further proceedings.

## I.

## BACKGROUND

The background facts are taken from the decision produced from these parties' previous visit to this Court, *Hayward v. Valley Vista Care Corp.*, 136 Idaho 342, 33 P.3d 816 (2001), and they are as follows. Eighty-five-year-old Delbert Hayward (Delbert) had been living in Valley Vista Care Center (Valley Vista), a nursing home facility in St. Maries, Idaho, for nearly a year when he died on February 16, 1995. Prior to taking residence at Valley Vista, Delbert lived at home with the assistance of home health care providers. In order to receive home health care services, the Idaho Department of Health and Welfare required Delbert to submit to periodic medical evaluations. Delbert was admitted to the Kootenai Medical Center on February 22, 1994 for one such evaluation. He was released to a personal care home in Hayden Lake on March 4, 1994. When he refused to eat and expressed a desire to return home, he was again admitted to Kootenai Medical Center on March 10, 1994. This time he was discharged to Valley Vista, where he lived until his death.

Alfred Hayward (Hayward), Delbert's son and the personal representative of his estate, sued Valley Vista, Jack's Pharmacy (which had filled prescriptions for Delbert), and Dr.

W. Dyce Thurston,[1] Valley Vista's medical director. Hayward claimed false imprisonment and breach of contract, and later moved to amend his complaint to add a claim for wrongful death stemming from allegedly negligent injection of the drug Haldol. The district court refused to allow Hayward to amend his complaint and granted Valley Vista's motion for summary judgment on Hayward's breach of contract claims. On appeal, we affirmed the district court's order regarding the breach of contract claims but reversed the district court's order refusing to allow Hayward to amend his complaint.

After our decision, Hayward filed a third amended complaint alleging that Delbert's death resulted from the negligence of Valley Vista, Dr. Thurston, and Jack's Pharmacy (including pharmacists Jack Botts and Chad Brown). All of the defendants moved for summary judgment. The district court denied Valley Vista's motion. Dr. Thurston's estate was partially successful. The court ruled that the claim against Dr. Thurston, in his capacity as Delbert's physician, must be dismissed since Hayward presented no expert testimony about the standard of care of physicians in St. Maries. However, the court allowed Hayward to proceed against Dr. Thurston's estate in the doctor's capacity as Valley Vista's medical director. It also granted Jack's Pharmacy's motion, finding that Hayward's pharmacy expert did not testify to the standard of care for dispensing (as opposed to in-house or consulting) pharmacies in St. Maries. The court also ruled that Hayward's pharmacy expert did not adequately familiarize himself with the local standard of care. Hayward filed a motion to reconsider and more information was submitted to the court. The court denied the motion and this appeal timely followed.

## II.

### STANDARD OF REVIEW

The claims at issue in this appeal were disposed of via summary judgment. When we consider appeals of orders on such motions, our standard of review is the same as that of the district court in considering the motion. *Thomson v. City of Lewiston,* 137 Idaho 473, 475, 50 P.3d 488, 491 (2002). Summary judgment is appropriate only when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." I.R.C.P. 56(c). The burden of establishing the absence of an issue of material fact is on the moving party. *Tingley v. Harrison,* 125 Idaho 86, 89, 867 P.2d 960, 963 (1994). To meet this burden, the moving party must "challenge in its motion and establish through evidence the absence of any genuine issue of material fact on an element of the nonmoving party's case." *Smith v. Meridian Joint Sch. Dist. No. 2,* 128 Idaho 714, 719, 918 P.2d 583, 588 (1996). Courts must liberally construe the record, and draw all reasonable inferences therefrom in the nonmoving party's favor. *Friel v. Boise City Hous. Auth.,* 126 Idaho 484, 485, 887 P.2d 29, 30 (1994). If the facts, when so construed, are such that reasonable persons could reach differing conclusions, summary judgment is not available. *Harris v. Department of Health & Welfare,* 123 Idaho 295, 298, 847 P.2d 1156, 1159 (1992).

## III.

### DISCUSSION

This appeal requires us to decide whether (1) Hayward's medical expert submitted competent testimony regarding the standard of care for the class of health care provider to which Dr. Thurston belonged and in which capacity he was functioning at the time of the alleged negligence and (2) Hayward's pharmacy expert submitted competent testimony regarding the standard of care applicable to Jack's Pharmacy and the breach thereof.

### A. The District Court Erred in Distinguishing Dr. Thurston's Roles as Medical Director and Physician.

Hayward contends the district court erred when it distinguished between Dr. Thurston's roles as Valley Vista's medical director and

---

1. Dr. Thurston passed away during the course of the litigation.

Delbert's treating physician, and then went on to rule that Hayward presented no expert testimony relating to the standard of care applicable to physicians in St. Maries. We agree.

In medical malpractice cases:

plaintiff must, as an essential part of his or her case in chief, affirmatively prove by direct expert testimony and by a preponderance of all the competent evidence, that such defendant then and there negligently failed to meet the applicable standard of health care practice of the community in which such care allegedly was or should have been provided, as such standard existed at the time and place of the alleged negligence of such physician and surgeon, hospital or other such health care provider and as such standard then and there existed with respect to the class of health care provider that such defendant then and there belonged to and in which capacity he, she or it was functioning.

I.C. § 6–1012. Section 6–1012 also provides the criteria by which a health care provider shall be judged: "Such individual providers of health care shall be judged in such cases in comparison with similarly trained and qualified providers of the same class in the same community, taking into account his or her training, experience, and fields of medical specialization, if any."

The applicable standard of care and the defendant's failure to meet it must be established by:

testimony of one (1) or more knowledgeable, competent expert witnesses, and such expert testimony may only be admitted in evidence if the foundation therefor is first laid, establishing (a) that such opinion is actually held by the expert witness, (b) that the said opinion can be testified to with reasonable medical certainty, and (c) that such expert witness possesses professional knowledge and expertise coupled with actual knowledge of the applicable said community standard to which his or her expert testimony is addressed. . . .

I.C. § 6–1013. If there is "no other like provider in the community and the standard of practice is therefore indeterminable, evidence of such standard in similar Idaho com-

munities at said time may be considered." I.C. § 6–1012. A competent expert witness from somewhere other than the locale at issue may "adequately familiariz[e] himself with the standards and practices of (a particular) such area. . . ." I.C. § 6–1013. An out-of-area expert witness with personal knowledge of the national standard of care may adequately familiarize himself with the applicable local standard of care by contacting a local physician who states that the local standard of care does not differ from the national standard of care. *Grover v. Smith*, 137 Idaho 247, 251, 46 P.3d 1105, 1109 (2002).

 We have consistently held that in order to survive a motion for summary judgment in medical malpractice cases, the plaintiff must offer expert testimony indicating the health care provider negligently failed to meet the standard of care for the class of health care provider to which he belonged and in which capacity he was functioning at the time of the alleged negligence. *Dulaney v. St. Alphonsus Reg'l Med. Ctr.*, 137 Idaho 160, 164, 45 P.3d 816, 820 (2002). Expert testimony introduced via affidavits must "set forth such facts as would be admissible in evidence and shall show affirmatively that the affiant is competent to testify as to the matters stated therein." *Rhodehouse v. Stutts*, 125 Idaho 208, 212, 868 P.2d 1224, 1228 (1994). Finally, an expert must state how he or she became familiar with the standard of care about which he or she is testifying. *Perry v. Magic Valley Reg'l Med. Ctr.*, 134 Idaho 46, 995 P.2d 816 (2000).

 Because the district court distinguished Dr. Thurson's roles as medical director and physician and allowed the claim against his estate to proceed insofar as it pertained to Dr. Thurston in his role as medical director, our task is to decide to what "class of health care provider" Dr. Thurston belonged, and, in what capacity was he functioning? Having considered the record, we believe that he was not sometimes a medical director and sometimes a physician; instead, he was at all times some of each. Recall, Dr. Thurston must be judged "in comparison with similarly trained and qualified providers of the same class in the same

community, taking into account his or her training, experience, and fields of medical specialization, if any." I.C. § 6–1012. Hayward's expert, Dr. Jay Luxenberg, a San Francisco-based physician and medical director of a nursing home, testified that the medical director and physician roles really are not separable in this case. Consider the following exchange between Dr. Luxenberg and counsel for Dr. Thurston's estate:

[Counsel for Dr. Thurston's Estate]: Regarding Dr. Thurston as potentially the Medical Director of Valley Vista, have you come to any opinions on a more probable than not basis that he breached a standard of care as Medical Director that was also a proximate cause of [Delbert's] death?

And let me say I do wish you to distinguish that from your prior testimony regarding Dr. Thurston which I assume was regarding his practice as an attending physician.

[Answer by Dr. Luxenberg:] Okay.

MR. EYMANN: I have to object to the form. If you understand the question, go ahead.

[Dr. Luxenberg]: I do understand the question, and I'll just state that it becomes a classic problem to distinguish the action of the Medical Director who also is serving as an attending physician in that their duties as Medical Director involve in essence supervision of the medical care as practiced within the facility which implies supervising their own care.

And so I will say that the faults that I found in terms of the prescription of long-acting Haloperidol in terms of his, Dr. Thurston's practice as an attending physician, imply an additional failure of supervision on his part as Medical Director.

I also as mentioned earlier felt that retaining a resident who has not signed in and in fact who actively demonstrates his desire to leave a facility against that person's will and administering medication against the will of a patient both are failures of standard of care, and the Medical Director has a duty to supervise the general practices of a nursing home. And if those are representative of the practice of

the nursing home, that would be a failure on his part as Medical Director.

I also acknowledge that an individual error of practice within a nursing home can't possibly be supervised by the attending—by the Medical Director, and that just a single example of a practice that falls below the standard of care of the nursing home does not necessarily mean that the Medical Director themselves fell below the standard of care.

So, in that respect I'll say that I only fault Dr. Thurston's failure to supervise Dr. Thurston in this case, but not his other actions as Medical Director.

[Counsel for Dr. Thurston's Estate]: Q. All right. So, if we can clarify this then, Doctor, regarding Dr. Thurston as potential Medical Director of Valley Vista, you have no opinions that he breached any standards of care other than regarding his own actions as a practicing attending physician?

[Dr. Luxenberg:] No, again as his practice as an attending physician went against the regulations of nursing home, and I'm certainly assuming that his own examination confirmed that he was aware that [Delbert] was not conserved and had the right to leave the facility, et cetera, then anything that he did as attending physician should have been stopped by the Medical Director, and his failure to do that implies a failure as medical director.

So, all the things that I object to in terms of the care of [Delbert] reflect on the practice of Dr. Thurston as Medical Director, but those aren't independent of his practice as attending physician.

The upshot of this testimony is, we believe, that when a medical director is actually treating the patient in the nursing home, in the manner in which Dr. Thurston was treating Delbert in this case, any particular act cannot be assigned separately to a particular capacity. As Dr. Luxenberg pointed out, if Dr. Thurston failed in his capacity as medical director, that failure is based on his own failures as a physician prescribing Haldol to a patient in a nursing home. We acknowledge the affidavit of Dr. Frederick Haller, who had served as medical director of a

nursing home in another small, rural Idaho community. He said, essentially, that when he was actually treating individual residents, he was acting as a physician and not a medical director. Under the statute, however, we are unable to split those hairs. In judging Dr. Thurston's performance as a physician, we cannot ignore his training and experience as a medical director—the individual charged with supervising patient care. He cannot simply swap his medical director hat for his physician hat depending on the service he was providing, especially in this case, where he was performing both simultaneously.

Neither can we ignore the place in which Dr. Thurston was treating Delbert: a nursing home facility—not an ordinary hospital or physician's office. The parties agree that nursing homes are required to follow federal and state guidelines relating to patient care, including the prescription of pharmaceuticals, and that they are responsible when those standards are not met. *See, e.g.,* 42 U.S.C. § 1396r; 42 C.F.R. §§ 483.25, 483.60; Idaho Admin. Code sec. 16.03.02.154.01.c. Therefore, it follows that the standard of care for a physician treating a patient in a nursing home would be governed by those standards.

▬ The alternative makes no sense: if a non-medical director physician treating a patient in a nursing home does not meet the standard to which the facility is held, or follows a lesser, local community standard, the nursing home as a facility has failed to meet the standard it is required to meet. To allow this result would thwart the purpose of the state or federal regulation—hence our rule that in cases where state or federal laws or regulations set forth minimum requirements for licensure of health care providers local communities are not free to adopt lower standards. *See, e.g., Grover v. Smith,* 137 Idaho at 252, 46 P.3d at 1110 (taking patient's medical history is a minimum requirement necessary to become licensed dentist in Idaho; local community may not adopt a local standard below licensing requirements). Accordingly, we believe the rationale in *Gro-*

*ver* applies in this case: a physician treating a patient in a nursing facility is not free to adopt a standard of care lower than that required of the nursing home in which the provider works. If the physician is functioning both as treating physician and as medical director of the facility, his or her standard of care includes the minimum standards set by applicable state and federal law.

**B. Hayward's Pharmacy Expert was Competent to Testify About the Standard of Care Applicable to Jack's Pharmacy.**

▬ The district court ruled that Hayward's pharmacy expert failed to properly establish the standard of care applicable to Jack's Pharmacy. Hayward contends this ruling is in error and we agree.[2]

Hayward offered the deposition testimony and affidavit of one Rex Lott, a pharmacist licensed in Washington (but not Idaho), who works for the Veteran's Administration Hospital in Boise. Lott holds a doctorate in pharmacy. He is an instructor of pharmacy at Idaho State University and has worked with nursing homes. To familiarize himself with the standard of care in St. Maries, he reviewed Delbert's medical records and the depositions of Jack Botts and Chad Brown, pharmacists at Jack's Pharmacy. He also contacted one Marvin Wheeler, who had worked as a pharmacist in St. Maries until 1992, when he began working on a fill-in or temporary basis.

Based on his review of Botts' and Brown's depositions and his discussion with Wheeler, Lott offered the following explanation of the standard of care:

> [T]he standards identified by Chad Brown and Jack Botts in their depositions are no different from the standards that I discussed with Marvin Wheeler ... My opinion is that, with respect to a retail pharmacist in St. Maries, Idaho, at the time, the principal standard of care was 'start low,

---

**2.** Throughout this action, the parties have operated on the assumption that I.C. § 6–1012 applies to retail pharmacies. Pharmacies are not specifically listed in the section, and it is not altogether clear whether the section does apply to pharma-

cies. On the other hand, the section is fairly all-inclusive. The question was never raised, however, and we need not decide it to resolve the case vis-à-vis Jack's Pharmacy.

go slow' in the dispensing or dosing of Haldol. A pharmacist has a duty to intervene when the 'start low, go slow' dosing for Haldol is not followed, such as with Delbert Hayward on March 18, 1994, when Mr. Hayward's orders for Haldol were increased from one-half milligram a day to a potential of well over 24 milligrams a day. The "start low, go slow" standard is not disputed. Lott stated further that under state regulations, pharmacists are "required to look at each drug order with a prospective view and evaluate the order for such things as rational therapy contraindications, reasonable dose, over utilization and abuse and misuse." This duty was identified by Jack Botts in his deposition.

Lott explained that the regulations applied to all retail pharmacies doing businesses with nursing homes:

> [T]he standard of care in St. Maries, Idaho, for the provision of pharmaceuticals to nursing home patients is the same whether in St. Maries, Boise, Spokane or Coeur d'Alene. The similarity in the standard of care is primarily because of the pervasive regulation of nursing homes by the United States government including their interpretive guidelines.

Lott said the regulations imposed on Jack's Pharmacy a duty to monitor the usage of drugs prescribed:

> Marvin Wheeler stated to me in 1999 that the regulations for nursing homes applied to all retail pharmacies doing business with nursing homes. Those regulations including the I.A.P.A. require contracts with unit dose pharmacies. Jack's Pharmacy was providing daily medication to Valley Vista Care Center which was distributed in a unit dose fashion. Therefore, these regulations applied to Jack's Pharmacy and its dispensing pharmacists.

Lott said also:

> The pharmacist must have an adequate system in place to identify that drugs are

delivered and billed correctly along with documentation of unused doses. The extensive errors I reviewed in this case, including notes indicating medications were dispensed on the non-existent dates of November 31, 1994 and April 31, 1994, fell below the minimum standard of care.

Lott concluded, based on his review of the information and guidelines, that Jack's Pharmacy should have contacted Dr. Thurston about the March 18, 1994 prescription and failing to do so "resulted in the chemical restraint and may have contributed to the physical decline of Delbert Lewis Hayward."

■ Based on the testimony recited above, we conclude that Lott satisfied the competency test. He reviewed the depositions of Botts and Brown, two St. Maries pharmacists, which indicated (1) the "start low, go slow" utilization standard of Haldol, and (2) the duty to alert the physician where it appears that a large or excessive dose has been prescribed. He confirmed with Wheeler that the standard of care imposed by state and federal regulations did apply to all pharmacies dispensing pharmaceuticals to nursing facilities and that the standard was the same, whether the dispensing occurred in St. Maries, Spokane, Coeur d'Alene, or Boise.[3] The testimony recited above also leads us to conclude that there is a question of fact on whether the standard was breached.

Having concluded that Lott was competent to testify, and that there was evidence the standard of care was breached, one additional point is worth discussing briefly. Jack's Pharmacy argued that if Hayward prevailed, the resultant rule would require Jack's Pharmacy to actually visit the nursing home and review the particular patient's records. Nothing in the evidence suggests so and nothing in our holding today should be construed to require this. We hold only that Lott was competent to testify as to the standard of care and its breach.

---

3. The district court found that there was no evidence in the record showing that Wheeler knew what the standard of care in Spokane, Coeur d'Alene, or Boise was. Whether Wheeler knew the standard in Boise or Spokane or even Omaha is irrelevant. All the statute requires is that the expert, in this case Lott, confirm with a local professional that the local standards do not differ from state or national standards. Explaining that the standards are the same in St. Maries as they are in other cities is simply a way to illustrate the point that the standard in St. Maries does not differ from the state or national standards.

## VI.

## CONCLUSION

Dr. Luxenberg's testimony about the standard of care applicable to a medical director treating a patient in a nursing facility was admissible and the district court erred in drawing the distinction between Dr. Thurston's roles as medical director and physician.

As for Jack's Pharmacy, Dr. Lott adequately familiarized himself with the local standard of care applicable to Jack's Pharmacy. While there is disagreement about what the standard of care is and whether it has been breached, Hayward's only obstacle to surviving summary judgment is offering competent and admissible expert testimony to show the standard of care and the breach thereof. Hayward has met this burden.

Accordingly, the rulings of the district court regarding Dr. Thurston in his capacity as Delbert's treating physician and regarding Jack's Pharmacy and its two pharmacists are vacated. The case is remanded for proceedings consistent with this decision. No party seeks attorney's fees, and therefore none are awarded. Costs are awarded to Hayward.

Chief Justice SCHROEDER, and Justices TROUT, EISMANN and BURDICK concur.

