## IN THE SUPREME COURT OF THE STATE OF IDAHO

### Docket No. 40762

GENE L. MATTOX, individually and as
Personal Representative of the Estate of
ROSAMOND VIVIAN MATTOX,

  Plaintiff-Appellant,

v.

LIFE CARE CENTERS OF AMERICA,
INC., d/b/a LIFE CARE OF LEWISTON, a
Tennessee Corporation,

  Defendant-Respondent,

and

JOHN DOES I-V, JANE DOES VI-X, and
JOHN DOE CORPORATIONS XI-XX,

  Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Coeur d'Alene, September 2014
Term

2014 Opinion No. 113

Filed: October 29, 2014

Stephen W. Kenyon, Clerk

---

Appeal from the District Court of the Second Judicial District of the State of Idaho, Nez
Perce County. Hon. Carl B. Kerrick, District Judge.

The judgment is <u>vacated</u> and the case is <u>remanded</u>.

Law Offices of Todd S. Richardson, PLLC, Clarkston, Washington, for appellant. Todd
S. Richardson argued.

Garrett Richardson, PLLC, Eagle, for respondent. Bradley S. Richardson argued.

---

J. JONES, Justice

    This is a medical malpractice case arising out of the treatment of Rosamond Mattox at
Life Care of Lewiston (LCL). The plaintiff-appellant, Rosamond's son Gene Mattox, claimed
that LCL's sub-standard care caused his mother's death. The district court excluded Gene's
experts' affidavits after concluding that they failed to demonstrate actual knowledge of the
applicable standard of health care practice. The district court then granted summary judgment in

1

favor of LCL.

# I.
## FACTUAL AND PROCEDURAL BACKGROUND

Life Care of Lewiston is a skilled nursing home that provides long-term and rehabilitative care in Lewiston, Idaho. Rosamond Mattox was a resident of LCL from 2003 until October 31, 2008, when she fractured her femur in a fall at age eighty-eight. She was transported to Tri-State Memorial Hospital in Clarkston, Washington. Emergency room physicians administered pain medication, after which Rosamond experienced nausea, vomiting, and aspiration. She suffered a progressive decline in respiratory status and was judged to be too unstable to proceed with what would have been a major surgery to repair her fracture. Having been placed in "comfort care" status, Rosamond's respiratory condition continued to decline and she died shortly after midnight on November 1, 2008. Her son, Gene, filed a complaint against Life Care Centers of America, Inc.—the entity that owns and operates LCL—and unnamed individuals involved in the care of his mother, alleging that she had a history of falling, LCL was aware of that history, LCL failed to provide adequate care to prevent future falls and resulting injuries, and LCL's sub-standard care was a proximate cause of her death.

LCL moved for summary judgment on the ground that Gene had failed to identify an expert who could testify that LCL's care fell below the standard of care for a skilled nursing facility in Lewiston in October of 2008 and that he had not produced any evidence that LCL's care was a proximate cause of Rosamond's death. LCL supported its motion with an affidavit from Carol McIver, the Director of Nursing Services for LCL at the time of Rosamond's death. In her very brief affidavit, Nurse McIver opined that "the care and treatment provided to Rosamond Mattox by the staff at Life Care Center of Lewiston complied in all respects with the applicable standard of health care practice."[1]

---

[1] Though Gene did not move to strike the affidavit as inadmissible, he argued in the district court, and again on appeal, that Nurse McIver's affidavit is conclusory and insufficient to carry LCL's burden as the movant on summary judgment. Because we hold that Gene's experts' affidavits should not have been excluded and the district court erred in granting summary judgment in favor of LCL, we need not address the adequacy of Nurse McIver's affidavit. We note, however, that it is not unusual for a defendant in a medical malpractice case to support a motion for summary judgment with an affidavit stating in very general, conclusory terms that the defendant complied with the applicable standard of care. We leave for another day the question of whether such an affidavit is admissible evidence and sufficient to shift the burden of production to the plaintiff in a medical malpractice case. We do, however, observe that whether an affidavit is submitted in support of, or in opposition to, a motion for summary judgment, it must contain admissible evidence. In a malpractice case that would include at a minimum the identification of the standard(s) of care at issue in the case.

Gene responded with two affidavits.[2] The first was from Dr. Jayme Mackay, Rosamond's primary care physician. Dr. Mackay stated that LCL's failure to follow his orders and LCL's own care plan for Rosamond was "a breach of the standard of care owed" to her. Dr. Mackay also discussed in detail his view that Rosamond's fall proximately caused her death. The second affidavit was from Wendy Thomason, a nurse with experience in skilled nursing homes outside of the Lewiston area. Nurse Thomason claimed that she acquired knowledge of the local standard of care by conducting interviews with four local professionals, reviewing the affidavit of Nurse McIver, reviewing state and federal regulations, and reviewing material concerning LCL, such as reviews, ratings, awards, and complaints. According to Nurse Thomason, LCL's care for Rosamond fell below the standard of care when it failed to follow Dr. Mackay's orders and its own care plan, which were intended to prevent Rosamond from suffering further falls and resulting injuries.

LCL argued that both affidavits were inadmissible because neither Nurse Thomason nor Dr. Mackay demonstrated that they had actual knowledge of the applicable standard of care as required by Idaho Code section 6-1013. Specifically, LCL argued that neither affidavit was admissible because the affiants failed to show that they had "actual knowledge of the applicable standard of health care practice for a long-term care facility in Lewiston during October of 2008."

The district court issued an opinion and order striking the affidavits of Nurse Thomason and Dr. Mackay and granting summary judgment to LCL. It held that the affidavits failed to establish that either Nurse Thomason or Dr. Mackay had actual knowledge of the "local standard of care for nurses in a skilled nursing facility in Lewiston, Idaho, in October, 2008." As a result, it concluded that neither affidavit was admissible under Section 6-1013. It then granted summary judgment for LCL due to the absence of evidence in the record to raise a question of material fact regarding whether LCL was negligent in caring for Rosamond. The district court thereupon entered judgment in favor of LCL, dismissing the complaint. Gene filed a timely appeal.

## II.
## STANDARD OF REVIEW

---

[2] In fact, Gene filed four affidavits, two each from Nurse Thomason and Dr. Mackay. After filing their initial affidavits, Gene subsequently filed a second affidavit from Nurse Thomason and a supplemental affidavit from Dr. Mackay. The district court focused exclusively on the latter two affidavits, which provide significantly more detail than the initial affidavits. We also focus on the latter two affidavits.

"On appeal from the grant of a motion for summary judgment, this Court utilizes the same standard of review used by the district court originally ruling on the motion." *Arregui v. Gallegos-Main*, 153 Idaho 801, 804, 291 P.3d 1000, 1003 (2012). Summary judgment is proper when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." I.R.C.P. 56(c). When considering "whether the evidence shows a genuine issue of material fact, the trial court must liberally construe the facts, and draw all reasonable inferences in favor of the nonmoving party." *Arregui*, 153 Idaho at 804, 291 P.3d at 1003.

"The admissibility of expert testimony, however, is a threshold matter that is distinct from whether the testimony raises genuine issues of material fact sufficient to preclude summary judgment." *Id.* With respect to the threshold issue of admissibility, "[t]he liberal construction and reasonable inferences standard does not apply . . . ." *Dulaney v. St. Alphonsus Reg'l Med. Ctr.*, 137 Idaho 160, 163, 45 P.3d 816, 819 (2002). Instead, "[t]he trial court must look at the witness' affidavit or deposition testimony and determine whether it alleges facts which, if taken as true, would render the testimony of that witness admissible." *Id.*

"A district court's evidentiary rulings will not be disturbed by this Court unless there has been a clear abuse of discretion." *McDaniel v. Inland Nw. Renal Care Grp.-Idaho, LLC*, 144 Idaho 219, 222, 159 P.3d 856, 859 (2007). In applying the abuse of discretion standard, we ask three questions: "(1) whether the lower court rightly perceived the issue as one of discretion; (2) whether the court acted within the boundaries of such discretion and consistently with any legal standards applicable to specific choices; and (3) whether the court reached its decision by an exercise of reason." *Id*. at 221−22, 159 P.3d at 858−59.

### III.
### ANALYSIS

Idaho Code section 6-1012 requires a plaintiff bringing a medical malpractice claim to prove by direct expert testimony that the defendant negligently failed to meet the applicable standard of health care practice. That standard is specific to "the time and place of the alleged negligence" and "the class of health care provider that such defendant then and there belonged to . . . ." *Id.* The defendant's care is judged against "similarly trained and qualified providers of the same class in the same community, taking into account his or her training, experience, and fields

of medical specialization, if any." *Id*. If a plaintiff fails to provide such evidence, the defendant is entitled to summary judgment. *Dulaney*, 137 Idaho at 164, 45 P.3d at 820.

Idaho Code section 6-1013 governs the manner in which such proof must be provided. When offering the opinion testimony of a "knowledgeable, competent expert" witness, the plaintiff must lay proper foundation by establishing:

> (a) that such an opinion is actually held by the expert witness, (b) that the said opinion can be testified to with reasonable medical certainty, and (c) that such expert witness possesses professional knowledge and expertise coupled with *actual knowledge of the applicable said community standard to which his or her expert testimony is addressed . . . .*

I.C. § 6-1013 (emphasis added). In addition, the requirements of I.R.C.P. 56(e) apply to "expert medical testimony submitted in connection with a motion for summary judgment." *Dulaney*, 137 Idaho at 164, 45 P.3d at 820. The party offering an affidavit must show that the facts set forth therein are admissible, that the witness is competent to testify regarding the subject of the testimony, and that the testimony is based on personal knowledge. *Id*. "Statements that are conclusory or speculative do not satisfy either the requirement of admissibility or competency under Rule 56(e)." *Id*. As a result, "[a]n expert testifying as to the standard of care in medical malpractice actions must show that he or she is familiar with the standard of care for the particular health care professional for the relevant community and time" and "how he or she became familiar with that standard of care." *Id*.

The district court held that the affidavits of Nurse Thomason and Dr. Mackay failed to provide adequate foundation under Section 6-1013 because neither affidavit demonstrated actual knowledge of the applicable standard of care. In doing so, it clearly abused its discretion. This Court does not require that an affidavit include particular phrases or state that the expert acquainted himself or herself with the applicable standard of care in some formulaic manner in order to establish adequate foundation under Section 6-1013. *See*, *e.g.*, *Bybee v. Gorman*, 2014 WL 4656517, *9 (Idaho Sept. 19, 2014) (holding that a district court erred in excluding an expert affidavit simply because the out-of-area expert claimed to have learned the applicable standard of care by consulting with an anonymous local expert); *Newberry v. Martens*, 142 Idaho 284, 292, 127 P.3d 187, 195 (2005) (holding that an ophthalmologist demonstrated actual knowledge of the applicable standard of care for family practice physicians "by practicing alongside family practice physicians . . . , by providing and obtaining referrals, and by discussing patient care with

them," though the ophthalmologist never explicitly asked about the standard of care); *Grover v. Smith*, 137 Idaho 247, 253, 46 P.3d 1105, 1111 (2002) (holding that an out-of-area dentist demonstrated actual knowledge of the applicable standard of care by demonstrating familiarity with state licensing requirements governing the practice of dentistry). The guiding question is simply whether the affidavit alleges facts which, taken as true, show the proposed expert has actual knowledge of the applicable standard of care. In addressing that question, courts must look to the standard of care at issue, the proposed expert's grounds for claiming knowledge of that standard, and determine—employing a measure of common sense—whether those grounds would likely give rise to knowledge of that standard. The obligation to demonstrate actual knowledge of the local standard of care is not intended to be "an overly burdensome requirement . . . ." *Frank v. E. Shoshone Hosp.*, 114 Idaho 480, 482, 757 P.2d 1199, 1201 (1988). Nor is the standard static and firmly rooted in past medical practices. Standards of care are sensitive to evolving changes in the way health care services are delivered in the various communities of our State. Indeed, the Court has recognized that "governmental regulation, development of regional and national provider organizations, and greater access to the flow of medical information," have provided "various avenues by which a plaintiff may proceed to establish a standard of care . . . ." *Suhadolnik v. Pressman*, 151 Idaho 110, 121, 254 P.3d 11, 22 (2011).

**A. The district court abused its discretion when it excluded Dr. Mackay's affidavit.**

The district court stated that Dr. Mackay's affidavit provides "no information whatsoever regarding his knowledge of the local standard of care for nurses in a skilled nursing facility in Lewiston, Idaho, in October, 2008." However, Dr. Mackay's affidavit provides ample reason to believe that he was familiar with the applicable standard of health care practice.

In his affidavit, Dr. Mackay testified:

I was Rosamond Vivian Mattox's primary care physician until her death on November 1, 2008. As Ms. Mattox's primary care physician, I requested specific orders be carried out for the safety and well-being of Ms. Mattox, additional precautions to protect Ms. Mattox were ordered as part of the Care Plan that was put in place by Life Care Center of Lewiston (LCL). These orders included, but were not limited to, the use of hip protectors, crash mats on the floor next to her bed, the use of side rails, having her bed set in the lowest position, a bed alarm, wheelchair alarm, toilet alarm, personal alarm, and two-person transfers.

During the course of 2008, or more specifically through the first ten months of 2008, I had approximately 30 nursing exchanges with LCL regarding Ms. Mattox. I cannot think of any other patient I have had that has required so much

6

interaction with the nursing staff at the nursing home. Some of the interactions were due to reported falls suffered by Ms. Mattox, and she suffered an excessive number of falls.

He concluded:

> Rosamond Mattox died as a result of an unbroken and reasonably anticipated chain of events that arose as a result of Life Care Center of Lewiston failing to provide and use the cautions which had been ordered (either by me or by the Care Plan). The failure to use those cautions was a breach of the standard of care that was owed by Life Care Center of Lewiston to Rosamond Mattox and that breach led to a series of falls that occurred in 2008 and culminated with a fractured hip/femur. That fractured hip/femur was the cause of her death . . . .

Though Dr. Mackay does not explicitly state that he had actual knowledge of the applicable standard of care, he asserts that he had a significant role in developing Rosamond's care plan, both through his orders and through input into LCL's care plan. On any reasonable reading of his affidavit, Dr. Mattox demonstrates actual knowledge of the applicable standard of care.[3]

While it is true that Dr. Mackay is not a nurse in a skilled nursing facility, "it is unnecessary for an expert witness to be of the same specialty as the defendant so long as the expert establishes he possesses actual knowledge of the standard of care to be applied." *Newberry*, 142 Idaho at 292, 127 P.3d at 195. Dr. Mackay wrote orders for Rosamond's care that specifically included precautions to prevent falls and there is no reason to believe that those orders did not establish care standards to be observed by LCL nurses. And, as he states, he had numerous exchanges with the nursing staff regarding her care and particularly the "excessive number of falls" she suffered. One would reasonably infer that these exchanges dealt with the care necessary to prevent falls and how the care being provided to Rosamond may have fallen short.

LCL argues that "Dr. Mackay set forth no specific facts for his alleged knowledge of Life Care's standard of care and how it was breached" and that Dr. Mackay's affidavit "is precisely the type of conclusory affidavit prohibited by *Dulaney* and *Arregui*." However, affidavits in those cases involved a common difficulty not present here.

---

[3] In her affidavit, Nurse Thomason states that "[Dr. Mackay] is personally aware of the standard of care for nurses in nursing homes in the Lewiston region in 2008." In addition, she states that Dr. Mackay "is the primary physician for a number of nursing home residents, and has done so [sic] for many years." Recognizing the existence of reciprocal vouching in this case and applying a certain amount of caution, Nurse Thomason's statements cannot be wholly discounted.

7

In *Dulaney*, the plaintiff fell and was taken to an emergency room with back pain. *Dulaney*, 137 Idaho at 162–63, 45 P.3d at 818–19. She alleged that an emergency room physician violated the applicable standard of health care practice by discharging her from the emergency room, though her back pain had not subsided and she was still unable to walk. *Id.* The plaintiff retained as an expert an out-of-area emergency room physician, who consulted with a local physician specializing in internal medicine in an attempt to learn the local standard of care for emergency room physicians. *Id.* at 165–66, 45 P.3d at 821–22. The district court held that the resulting affidavit was inadequate under Section 6-1013 because there was no evidence that the local expert specializing in internal medicine had actual knowledge of the standard of care regarding the discharge of patients from local emergency rooms. *Id.* at 166, 45 P.3d at 822. This Court agreed, stating that, though "[i]t may certainly be possible that while practicing internal medicine in Boise . . . [the local expert] became familiar with the local standard of care for emergency room physicians. . . . [,] there are no facts in the record so showing . . . ." *Id.*

In *Arregui*, the plaintiff filed a complaint against a chiropractor for malpractice in the treatment of "torticollis." *Arregui*, 153 Idaho at 803, 291 P.3d at 1002. The plaintiff retained an out-of-area expert, who consulted a local chiropractor to determine the relevant standard of care. *Id*. This Court affirmed the district court's finding that the affidavit was insufficient under Section 6-1013. *Id.* at 809–10, 291 P.3d at 1008–09. The Court noted that the affidavit "never identified the local chiropractor, . . . did not describe the type of chiropractic practice he ran, nor how he became aware of the local standard of care, how long he practiced in the . . . area, or whether he was familiar with torticollis and the specific procedures allegedly used on the Patient." *Id* at 809, 291 P.3d at 1008. The Court emphasized this last factor, stating that "in a medical malpractice case, it must be shown that the expert possesses sufficient knowledge of the specific procedures used by the defendant physician as the alleged malpractice." *Id*. Because there was no reason to believe that the local chiropractor was familiar with the treatment of torticollis, there was no reason to think he was familiar with the standard of care with respect to that treatment.

In both *Dulaney* and *Arregui*, this Court identified the care allegedly constituting malpractice and noted that the affidavits provided no reason to believe that the local expert had actual knowledge concerning the local standard governing that type of care. In *Dulaney*, the affidavit provided no reason to think that the local specialist in internal medicine regularly

8

interacted with emergency room physicians in a professional capacity, much less that such interaction acquainted him with standards governing the discharge of patients from an emergency room. In *Arregui*, there was no indication that the local chiropractor treated torticollis, the treatment with respect to which malpractice allegedly occurred. By contrast, the alleged malpractice in this case involved the failure to comply with physician's orders and LCL care plan provisions designed to prevent falls and injuries. Dr. Mackay was the person who gave the physician's orders and he certainly could have expected LCL to carry out those orders. He regularly interacted with LCL to coordinate care for Rosamond. As the primary care physician for Rosamond and other elderly patients in area nursing homes, there is excellent reason to believe that he would have been familiar with the standard of care governing compliance with his own orders and with LCL's care plan. It is difficult to see how Dr. Mackay could function as Rosamond's primary care physician without such knowledge. Dr. Mackay's affidavit provided adequate foundation under Section 6-1013 and the district court clearly abused its discretion in excluding it.

### B. The district court abused its discretion when it excluded Nurse Thomason's affidavit.

The district court held that Nurse Thomason's affidavit provided inadequate foundation under Section 6-1013. Though the district court acknowledges that Nurse Thomason appealed to additional sources to demonstrate her knowledge of the standard of care, the district court's opinion focuses exclusively on the interviews she conducted to learn that standard. It found that "[n]othing in Thomason's affidavits establishes that Ms. Thomason became knowledgeable regarding the local standard of care by speaking with an individual who was familiar with the local standard of skilled nursing facility care, in Lewiston, Idaho, in October and November of 2008." In particular, according to the district court, the affidavit provided no reason to think that the persons Nurse Thomason interviewed had actual knowledge of the applicable standard of care. Thus, the affidavit could not show that those parties passed that knowledge along to Nurse Thomason.

The district court clearly abused its discretion. Nurse Thomason's interviews were alone sufficient to demonstrate actual knowledge of the applicable standard of care. The state and federal regulations to which Nurse Thomason appealed provide additional reason to think that she knew the relevant standard of care.

9

Nurse Thomason's affidavit states that she has been a registered nurse since 1989. Though she has extensive experience providing care in skilled nursing facilities and has given expert testimony in Idaho and elsewhere concerning the standard of care in such facilities, she does not claim that she ever practiced in Lewiston, Idaho. Idaho Code section 6-1013 provides that an otherwise competent expert witness who resides elsewhere may become familiar with the local standard of care in order to offer expert testimony. As with any expert, an out-of-area expert must "state how he or she became familiar with that standard of care." *Dulaney*, 137 Idaho at 164, 45 P.3d at 820. "One method for an out-of-area expert to obtain knowledge of the local standard of care is by inquiring of a local specialist." *Id.* When this method is employed, the affidavit must provide adequate reason to believe that the local specialist interviewed has actual knowledge of the applicable standard of care. *See id.* at 166–67, 45 P.3d at 822–23 (striking the affidavit of an out-of-area expert because the affidavit provided inadequate reason to believe that the local expert interviewed had actual knowledge of the standard of care).

Nurse Thomason interviewed Dr. Mackay regarding the applicable standard of care. Because Dr. Mackay's affidavit established that he had actual knowledge of that standard, the district court was mistaken when it claimed that Nurse Thomason failed to interview anyone with such knowledge. Nurse Thomason's claim to have interviewed Dr. Mackay provided adequate grounds to conclude that she was acquainted with that standard through him.

In addition, Nurse Thomason interviewed Debbie Lemon. Nurse Thomason's affidavit states that Debbie Lemon is an Associate Professor of Nursing at Lewis-Clark State College with a "Masters degree in Nursing focusing on Elderly nursing/education." Professor Lemon's *curriculum vitae*—submitted with Nurse Thomason's affidavit—states that she has been teaching at Lewis-Clark State College since 2004, much of that time in the school's "Practical Nursing Program," which included a geriatric clinical rotation. Professor Lemon is a registered nurse with extensive experience as a consultant and administrator in Lewiston area nursing homes, rehabilitation centers, and adult homes. During 2008, while also teaching at Lewis-Clark State College, Professor Lemon was a nurse consultant at Sycamore Glen, an adult family home in Clarkston, where her duties included: "Nurse Delegation, medication management for the residents, nursing assessments, staffing and scheduling, other administrative duties as needed. Review, and consult on implementation of new state and federal regulations."

LCL argues that "the affidavit fails to show how being an associate professor at Lewis

and Clark in Lewiston in 2008 gave [Professor Lemon] actual knowledge of the applicable standard of care for this class of health care provider." According to LCL, "[s]imilar to the professor expert in *Dulaney*, Nurse Thomason alleged no specific facts that as a professor, she remained in contact with any former student working as a nurse in a long-term care facility, or taught the applicable standard of care for Lewiston in 2008." Further, "she did not testify that she practiced nursing in a skilled nursing facility in Lewiston, in October of 2008."

LCL's comparison with *Dulaney* is inapt. In *Dulaney*, this Court found that an affidavit failed to demonstrate actual knowledge of the applicable standard of care where the expert claimed to have learned the standard of care for orthopedic surgeons in Boise in 1994 from an anonymous professor. *Dulaney*, 137 Idaho at 169, 45 P.3d at 825. The professor claimed to have trained orthopedic surgeons "that presently practice in Boise." *Id.* In affirming the district court's view that the affidavit was inadequate, the Court focused on the absence of a connection between the professor's experience training surgeons and the relevant time period. *Id.* The Court noted that the affidavit did not state whether the professor was teaching in Boise in 1994 or whether any of the surgeons the professor trained were practicing in Boise in 1994. *Id.* Here, by contrast, there is no question that Professor Lemon was teaching nursing in Lewiston in 2008.

LCL suggests that, though Professor Lemon may have been teaching in Lewiston in 2008, the affidavit does not state that she was teaching the relevant standard of care. Neither Nurse Thomason's affidavit nor Professor Lemon's *curriculum vitae* discuss the courses Professor Lemon was teaching in 2008. Professor Lemon's *curriculum vitae* makes clear, however, that her teaching and nursing expertise was in care for the elderly. She completed her master's degree in 2006 with an emphasis on elder care. From 1992 to 2009, she was licensed in Idaho as an administrator for long-term care facilities. She served as the administrator and director of nursing at a rehabilitation and living center in Lewiston, which she described as "a 127 bed skilled nursing center with a successful therapy program and Alzheimer's Unit," from 1987 to 1995. From May 1996 to November 1998 she served as director of nursing of Tri-State Health & Rehabilitation Center, just across the river in Clarkston, Washington.[4] She served as

---

[4] LCL emphasizes that Nurse Thomason stated in both of her affidavits that she was familiar with the standard of care in the "Lewiston region" and claims that this was insufficient to satisfy the geographic requirement in Section 6-1012. The district court seems to have agreed, specifically referring in its ruling to the standard of care in "Lewiston, Idaho." This draws too fine a distinction. Idaho Code section 6-1012 defines the standard-of-care community as the "geographical area ordinarily served by the licensed general hospital at or nearest to which such care was or allegedly should have been provided." The record discloses that two hospitals serve Lewiston, Idaho—

11

administrator of that facility for the next two years. She began teaching at Lewis-Clark State College in Lewiston in 2004, continuing through the time of Rosamond's death. Just two weeks before Rosamond's death, she attended a conference of the Geriatric Nurse Educators Consortium on the subject of "Enhancing Gerontology Content in Senior-level Baccalaureate Courses." Therefore, Nurse Thomason's affidavit provides good reason to believe Professor Lemon knew the standard of care relevant here and that she imparted it to Nurse Thomason.

Further, Nurse Thomason identifies state and federal regulations as a source of her knowledge regarding the applicable standard of care. The district court did not address the argument that Nurse Thomason was familiar with the local standard of care in skilled nursing facilities by virtue of being familiar with state or federal regulations governing that care.

Where "an expert demonstrates that a local standard of care has been replaced by a statewide or national standard of care, and further demonstrates that he or she is familiar with the statewide or national standard, the foundational requirements of I.C. § 6-1013 have been met." *Suhadolnik*, 151 Idaho at 116, 254 P.3d at 17 (footnotes omitted). Only regulations that concern the "physical administration of health services" can replace a local standard of care for purposes of Idaho Code sections 6-1012 and 6-1013. *McDaniel*, 144 Idaho at 223, 159 P.3d at 860. This Court has previously recognized that federal and state regulations governing the care provided in skilled nursing facilities provide minimum standards for purposes of Sections 6-1012 and 6-1013. *See Hayward v. Jacks Pharmacy Inc.*, 141 Idaho 622, 628, 115 P.3d 713, 719 (2005) (holding that because "nursing homes are required to follow federal and state guidelines relating to patient care, including the prescription of pharmaceuticals, and . . . are responsible when those standards are not met . . . . it follows that the standard of care for a physician treating a patient in a nursing home would be governed by those standards") (citations omitted). Nurse Thomason points to specific state and federal regulations governing the operation of nursing facilities that are relevant to the care at issue in this case.

---

Tri-State Memorial Hospital in Clarkston, Washington, and St. Joseph Medical Center in Lewiston. Although the parties do not delve deeply into this issue, the Lewiston-Clarkston area certainly appears to be one medical community. When Rosamond suffered her fall at LCL, she was transported to the hospital in Clarkston. The Court recently considered the issue of what constitutes a medical community for purposes of determining the appropriate standard of care and determined that common sense should apply in making that determination—"If users of the hospital's services commonly go from one location to the place where the hospital is located, then that location falls within the geographic area which constitutes the community. As we implicitly recognized in *Ramos* [*v. Dixon*, 144 Idaho 32, 156 P.3d 533 (2007)], it is because people residing at one location may commonly use the services provided by more than one hospital, communities may overlap one another." *Bybee*, 2014 WL 4656517, at *6.

Federal regulations govern the certification of long-term and skilled nursing facilities as participants in the Medicare and Medicaid programs and require such facilities to meet certain standards of care. 42 C.F.R. pt. 483 (2014). Those regulations require such facilities to "develop a comprehensive care plan for each resident that includes measurable objectives and timetables to meet a residents medical, nursing, and mental and psychosocial needs that are identified in the comprehensive assessment." *Id.* § 483.20(k)(1). The same regulations provide that "[e]ach resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychological well-being, in accordance with the comprehensive assessment and plan of care." *Id.* § 483.25. That care must include "adequate supervision and assistance devices to prevent accidents." *Id.* § 483.25(h)(2).

Similarly, IDAPA 16.03.02—"Rules and Minimum Standards for Skilled Nursing and Intermediate Care Facilities"—sets out "regulations and standards for the provision of adequate care and licensure of Skilled Nursing and Intermediate Care Facilities in the state of Idaho." IDAPA 16.03.02.001.02. Those regulations require that "[a] patient/resident plan of care shall be developed in writing upon admission of the patient/resident," and that the plan will reflect the patient's needs, be reviewed and updated as needed, and be available to all personnel caring for the patient. IDAPA 16.03.02.200.03(a). "Patient/resident needs shall be recognized by nursing staff and nursing services shall be provided to assure that each patient/resident receives care necessary to meet his total needs," IDAPA 16.03.02.200.03(b), including "[p]rotection from accident or injury." IDAPA 16.03.02.200.03(b)(vi).

Nurse Thomason points out the care plan developed for Rosamond by LCL "stated: Potential for further falls with history of frequent falls . . . . Goal stated that Ms. Mattox 'will have no serious injuries requiring hospitalization.' Interventions included: bilateral cane rails; encourage to use call light for assist with transfers, keep call light within reach and phone in easy reach; audible alarms on wheelchair and bed; do not leave unattended on toilet; assist to and from meals; assist to lay down; hip protectors out of bed; low bed and crash mats on floor."

The federal and state regulations and the facility's care plan developed pursuant thereto are relevant to the alleged malpractice at issue in this case. Rosamond's individual care plan was required by the regulations and it set the minimum standard of care required to be observed in order to protect Rosamond from falls. Gene claims that LCL violated the minimum standard of care, as well as the doctor's orders, resulting in Rosamond's injury and death. Nurse Thomason

appropriately identifies the minimum standard set by the regulations as the applicable standard of care in this case, which provides additional support for the proposition that her affidavit testimony had sufficient foundation.

Nurse Thomason goes on to say in her affidavit that LCL violated the standard of care with respect to Rosamond by failing to follow Dr. Mackay's orders and LCL's own care plan. Nurse Thomason identifies a list of precautions that formed part of that care plan and which were intended to ensure that Rosamond would not be injured in a fall. That list included the use of bed rails, a bed set to its lowest position, the use of hip protectors, and the observation of a regular check and change schedule. Based on her review of LCL's records relating to Rosamond, Nurse Thomason states that—between July and October of 2008—LCL was 74% non-compliant with the use of bed rails, 86% non-compliant in positioning Rosamond's bed in the lowest position, 99.3% non-compliant with the use of hip protectors, and 86% non-compliant with the check and change program, in addition to other alleged failings.

The district court erred in concluding that Nurse Thomason's affidavit was inadmissible for want of foundation. She demonstrated an adequate knowledge of the applicable standard of care at issue in this case and submitted pertinent facts to establish a *prima facie* case of breach of the standard.

## C. The district court erred in granting summary judgment.

The affidavits here were clearly admissible. Both affidavits establish actual knowledge of the applicable standard of health care practice and the means by which Dr. Mackay and Nurse Thomason became familiar with that standard. The affidavits should have been admitted and, had they been, they present genuine issues of material fact that would preclude summary judgment. Having improperly excluded Gene's expert affidavits, the district court erred in granting LCL's motion for summary judgment based entirely on the absence of expert testimony satisfying the requirements of Section 6-1013.

## D. The district court's failure to grant summary judgment for Gene is not reviewable.

When LCL moved for summary judgment, Gene argued in opposition that he was entitled to summary judgment. Though he never filed a summary judgment motion in the district court, "[t]he district court may grant summary judgment to a non-moving party even if the party has not filed its own motion with the court." *Harwood v. Talbert*, 136 Idaho 672, 677, 39 P.3d 612, 617

14

(2001). On appeal, he claims that "the Defendants were unable to demonstrate a genuine issue of fact, while the Plaintiffs established facts of the breach of the standard of care and proximate cause of the death of Rosamond. With such a record, summary judgment should have been granted in favor of Plaintiffs and against the Defendants." Gene requests that this Court grant summary judgment in his favor and "remand for a trial on the issue of damages only."

"[A]n order denying a motion for summary judgment is not subject to review—even after the entry of an appealable final judgment." *Dominguez ex rel. Hamp v. Evergreen Res., Inc.*, 142 Idaho 7, 13, 121 P.3d 938, 944 (2005). Because Gene never filed a motion for summary judgment, the district court did not issue an order denying any such motion. Had it done so, that order would not have been reviewable because the denial of a motion for summary judgment "does not resolve any claims." *Idaho Dept of Labor v. Sunset Marts, Inc.*, 140 Idaho 207, 210, 91 P.3d 1111, 1114 (2004). Similarly, the failure to grant summary judgment in favor of a non-moving party does not resolve any claims. As a result, the district court's failure to grant summary judgment in favor of Gene is not reviewable.

### E.  LCL is not entitled to attorneys' fees on appeal.

LCL requests attorneys' fees pursuant to Idaho Code section 12-121 and I.A.R. 41(a). Because LCL is not the prevailing party, LCL is not entitled to fees on appeal.

## IV.
## CONCLUSION

We vacate the judgment of the district court dismissing Gene's action against LCL and remand the case to the district court for further proceedings consistent with this opinion. Costs on appeal are awarded to Gene.


Chief Justice BURDICK, and Justices EISMANN and HORTON and Justice Pro Tem WALTERS CONCUR.

15