# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 45214

PHILLIP ELDRIDGE and MARCIA
ELDRIDGE, husband and wife,

      Plaintiffs-Appellants,

v.

GREGORY WEST, M.D., LANCE TURPIN,
PA-C, and SUMMIT ORTHOPAEDICS
SPECIALISTS, PLLC,

      Defendants-Respondents,

and

EASTERN IDAHO HEALTH SERVICES,
INC., dba EASTERN IDAHO REGIONAL
MEDICAL CENTER,

      Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, May 2019 Term

Opinion Filed: February 18, 2020

Karel A. Lehrman, Clerk

SUBSTITUTE OPINION. THE
COURT'S PRIOR OPINION
DATED DECEMBER 20, 2019 IS
HEREBY WITHDRAWN.

Appeal from the District Court of the Seventh Judicial District, State of Idaho, Bonneville County. Richard T. St. Clair, Senior District Judge.

The orders of the district court are <u>affirmed</u> in part, <u>vacated</u> in part, and <u>remanded</u>.

Cooper & Larsen, Chartered, Pocatello, for appellants. Javier Gabiola argued.

Hawley Troxell Ennis & Hawley, LLP, Pocatello, for respondents. Julian E. Gabiola argued.

---

STEGNER, Justice.

    This is a permissive appeal brought by Phillip and Marcia Eldridge[1] in a medical malpractice action brought by them against Dr. Gregory West (West), Lance Turpin, PA-C (Turpin), and Summit Orthopaedics Specialists, PLLC (Summit). The Eldridges allege that

---

[1] Phillip and Marcia Eldridge are husband and wife. "Phillip" will refer to Phillip Eldridge as an individual. The use of the plural "Eldridges" will refer to both Phillip and Marcia Eldridge.

1

Phillip became infected with Methicillin-Resistant Staphylococcus Aureus (MRSA) as a result of malpractice committed by West, Turpin, and agents of Summit. The Eldridges claim West and Turpin breached the standard of care that was due them and as a result, sustained damages. The district court granted various motions, including a motion to dismiss certain causes of action against West, Turpin, and Summit, as well as a motion for summary judgment brought by Turpin and Summit, and a motion for partial summary judgment brought by West.

In their appeal, the Eldridges contend that the district court erred in (1) dismissing their claims for negligent and intentional infliction of emotional distress, gross negligence, and reckless, willful, and wanton conduct; (2) denying their motion to strike the affidavits of West and Turpin; (3) limiting their claim for damages; and (4) concluding that the Eldridges could only present evidence of damages, specifically medical bills, after the Medicare write-offs had been calculated. For the reasons set out in this opinion, the district court's orders are affirmed in part and vacated in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Phillip's hip replacement surgery and subsequent complications.

Phillip began complaining of hip problems in the summer of 2009, which resulted in West performing hip replacement surgery on Phillip's right hip in October 2009. In the fall of 2011, Phillip began experiencing pain in that hip. In April 2012, Phillip underwent another surgery to loosen a tendon to relieve some of the ongoing pain. Following the April surgery, Phillip underwent aspirations of his hip to determine whether he was suffering from bacterial growth. When the fluid samples were cultured, there was no infection evident. Phillip continued to complain of pain. In October of 2012, he underwent a CT scan to determine whether there were loose components in his artificial hip. The results of the CT scan indicated an absence of loose components. Phillip underwent additional aspirations of the hip twice in October 2012, neither of which showed any bacterial growth. Despite the negative tests, Phillip was placed on antibiotics.

On October 29, 2012, West performed what he later described as exploratory surgery on Phillip's hip. West's putative goal was to determine the source of Phillip's pain, as well as the potential replacement of components if an infection were found. All of the test results from the samples sent to the pathology department indicated there was no infection in the hip. (Because Phillip was receiving antibiotics at the time, the likelihood of the test being positive was greatly

diminished.) Rather than explant the hip in its entirety, West replaced only the metal ball at the head of the femur with a ceramic ball. Following the October 29 surgery, Phillip experienced numerous adverse complications. He dislocated his hip three separate times between November 4 and November 6, 2012. As a result, West performed another revision surgery on December 3, 2012.

On December 18, 2012, Phillip arrived at the emergency room at Eastern Idaho Regional Medical Center in an "altered mental state." The following day, West again performed surgery on the hip and discovered a large pocket of blood near, but not in, the hip joint. West cleaned the region, placed antibiotic beads in the area, and began administering intravenous antibiotics to Phillip.

Phillip was diagnosed with MRSA on December 20, 2012. During December 2012 and January 2013, Phillip underwent multiple procedures in an effort to eradicate the MRSA from the hip joint. These procedures included surgeries and aspirations. The treatment Phillip received did not resolve his MRSA. Consequently, on March 2, 2013, West recommended explantation of the entire hip, in an effort to eradicate the MRSA. Phillip sought to delay this procedure. However, as his condition deteriorated over the next few days, West again recommended the full explant, which was ultimately performed on March 13, 2013. According to West, the explant surgery took additional time because the hip was "really in there" and was complicated to remove. On April 24, 2013, Phillip had another surgery to remove the antibiotic spacer and other metal components that had been placed during the explant surgery. At around this time, Phillip transferred his care to providers in the Salt Lake City area. In July of 2013, Phillip had two additional procedures performed at the University of Utah Hospital to clean the area where the hip replacement had been removed.

Phillip began seeing Dr. Aaron Altenburg (Altenburg) in August of 2013. After a MRSA screening prior to surgery came back negative, Phillip received another full right hip replacement in October 2013. Phillip again developed MRSA in his right hip in February of 2014. That hip had to be removed as well. On February 23, 2016, Phillip underwent another hip replacement which was also performed at the University of Utah. Due to his many procedures and infections, Phillip's quality of life has dramatically worsened. He is unable to walk and will be required to be on antibiotics for the remainder of his life. He has also suffered impaired kidney function, which has required him to be on dialysis.

**B.      Course of Proceedings.**

On October 15, 2013, the Eldridges filed a verified complaint against West, Turpin, Summit, and others.[2] The complaint alleged that West and Turpin breached the applicable standard of care when caring for Phillip. In their original complaint, the Eldridges alleged claims for medical malpractice, loss of consortium, negligent infliction of emotional distress, intentional infliction of emotional distress, and gross negligence, reckless, willful and wanton conduct.[3]

On March 5, 2014, after filing their answer, West, Turpin, and Summit joined in their codefendants' partial motion to dismiss the claims of intentional infliction of emotional distress, negligent infliction of emotional distress, and gross negligence, reckless, and willful and wanton conduct on the ground that those claims had all been subsumed by the Idaho Medical Malpractice Act, Idaho Code sections 6-1001 to 6-1014. The district court agreed and granted the motions to dismiss.

West, Turpin, and Summit filed their first motion for summary judgment on September 18, 2014, alleging that the Eldridges had failed to produce admissible evidence that showed that they had breached the applicable standard of care. In support of their motion, West, Turpin, and Summit submitted affidavits from Turpin and West. Both affidavits generally asserted that each practitioner had been practicing in Idaho Falls for a number of years and stated that they had both acted consistently with the standard of care without describing the standard of care or how the treatment they provided had conformed with it. On May 1, 2015, West, Turpin, and Summit filed a second motion for summary judgment, reasserting the arguments made in their first motion.

On June 11, 2015, the Eldridges filed a memorandum in opposition to the motion for summary judgment, including a detailed description of the treatment provided to Phillip by West and Turpin, which was supported by an affidavit from the Eldridges' medical expert, Dr. Mauro Giordani (Giordani). On the same day, the Eldridges also moved to strike paragraphs 3 through 6 of West's first affidavit and paragraphs 3 through 6 of Turpin's affidavit. The district court denied the Eldridges' motion to strike the affidavits, finding that their years of practice in Idaho

---

[2] The Eldridges settled with the other defendants named in the complaint. Only West, Turpin, and Summit remain as defendants.
[3] The claim of gross negligence, reckless, and willful and wanton conduct are all contained in one count in the original complaint, even though our jurisprudence distinguishes between gross negligence and reckless or willful and wanton behavior.

Falls were sufficient to establish a foundation of personal knowledge of the standard of care for that community. Instead, the district court struck portions of Giordani's affidavit concluding a lack of foundation as to Giordani's knowledge regarding the standard of care in Idaho Falls.

The Eldridges filed a motion for reconsideration, along with a new declaration from Giordani. West, Turpin, and Summit opposed the motion. On September 11, 2015, the district court denied the Eldridges' motion for reconsideration and affirmed its decision that the affidavits from West and Turpin would be allowed to stand as written. In addition, it affirmed its previous order that portions of Giordani's declaration lacked adequate foundation. The district court did, however, reconsider Giordani's declaration concerning West because the doctor who had consulted with Giordani (Dr. Selznick) was aware of West's practices in Idaho Falls. The district court granted summary judgment to Turpin due to a lack of evidence that demonstrated how Turpin, a physician's assistant, had violated the standard of care in Idaho Falls.

On April 18, 2016, West and Summit filed a third motion for summary judgment, supported by West's second affidavit. In response, the Eldridges filed another declaration from Giordani. On June 10, 2016, West filed another affidavit addressing additional issues and attaching additional medical records. The Eldridges again objected to both affidavits filed by West.

On July 22, 2016, the district court made several rulings. First, the district court excluded Giordani's opinion that Phillip's hip had been infected with MRSA on October 29, 2012, concluding there was no admissible evidence that the hip was, in fact, infected on that date. As a result, the district court denied the Eldridges' motion for summary judgment on their claim regarding the treatment provided by West once MRSA was found because it was possible that a jury could determine, based on the evidence admitted, that the surgeries from December 3, 2012, to March 13, 2013, could have been avoided. Following the decision dated July 22, 2016, the only remaining claim was whether West had breached the standard of care by failing to remove the hip as soon as MRSA was diagnosed on December 20, 2012.

West and Summit filed a fourth motion for summary judgment alleging there was no admissible evidence that conservative treatment of the MRSA, instead of an immediate explant, had caused damages. In the alternative, they argued that damages incurred after the explant had been performed on March 13, 2013, should be precluded. The reason proffered for limiting the damages was West's contention that Giordani had not reviewed any of the medical records after

April 24, 2013. Following briefing and a hearing, the district court granted summary judgment and limited damages to those sustained between December 20, 2012, and April 24, 2013. The district court found that the declaration of Giordani did not satisfy the disclosure requirements set out in Rule 26(b)(4)(A), I.R.C.P.

Finally, the district court granted West's motion in limine to admit only evidence of the medical expenses that the Eldridges had actually paid, rather than the amounts billed prior to the application of the Medicare write-offs. The Eldridges then sought to have the district court's rulings reviewed via a permissive appeal. This Court accepted the application for permissive appeal.

## II. STANDARD OF REVIEW

"When this Court reviews an order dismissing an action pursuant to I.R.C.P. 12(b)(6), we apply the same standard of review we apply to a motion for summary judgment" in so far as all reasonable inferences will be drawn in favor of the non-moving party. *Losser v. Bradstreet*, 145 Idaho 670, 672–73, 183 P.3d 758, 760–61 (2008) (citation omitted). "A 12(b)(6) motion looks only at the pleadings to determine whether a claim for relief has been stated." *Hammer v. Ribi*, 162 Idaho 570, 573, 401 P.3d 148, 151 (2017) (citation omitted).

This Court employs the same standard as the district court when reviewing rulings on summary judgment motions. *La Bella Vita, LLC v. Shuler*, 158 Idaho 799, 804–05, 353 P.3d 420, 425–26 (2015) (citing *Wesco Autobody Supply, Inc. v. Ernest*, 149 Idaho 881, 890, 243 P.3d 1069, 1078 (2010)). "The court must grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." I.R.C.P. 56(a).

When reviewing the trial court's evidentiary rulings, this Court reviews those decisions for an abuse of discretion. *Dulaney v. St. Alphonsus Reg'l Med. Ctr.*, 137 Idaho 160, 163–64, 45 P.3d 816, 819–20 (2002) (citation omitted). When reviewing a lower court's decision for an abuse of discretion, this Court must analyze "whether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018) (citing *Hull v. Giesler*, 163 Idaho 247, 250, 409 P.3d 827, 830 (2018)).

III. ANALYSIS

**A. Idaho's Medical Malpractice Act does not supplant common law causes of action relating to medical malpractice.**

The district court dismissed the Eldridges' claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and gross negligence, reckless, and willful and wanton conduct, concluding that those causes of action had been "subsumed"[4] by Idaho Code section 6-1012. On appeal, the Eldridges argue that Idaho appellate courts have never held that these various causes of action have been supplanted by Idaho Code section 6-1012. West, Turpin, and Summit argue that the district court properly dismissed these various causes of action because the statute precludes them and it furthers the legislative intent of the statute to construe them as having been supplanted.

Idaho Code section 6-1012 states, in relevant part,

> In any case, claim or action for damages due to injury to or death of any person, brought against any physician and surgeon or other provider of health care . . . on account of the provision of or failure to provide health care or on account of any matter incidental or related thereto, such . . . plaintiff must . . . affirmatively prove by direct expert testimony . . . that such defendant then and there *negligently* failed to meet the applicable standard of health care practice of the community . . . .

I.C. § 6-1012 (italics added).

Title 6, Chapter 10 of the Idaho Code is entitled, "Medical Malpractice." The statute is the legislature's effort to codify matters that fall within the ambit of medical malpractice. "The terms 'negligence,' 'professional negligence,' and 'malpractice' have, in general, been used interchangeably by the courts, but occasionally, an effort has been made to differentiate." 4 *American Law of Torts* § 15:1 (2019) (footnote omitted). In *Sisters of Mercy v. Gaudreau, Inc.*, 423 A.2d 585, 585 (Md. Ct. Spec. App. 1980), the Maryland Court of Special Appeals wrote:

> The difference between negligence and malpractice is the matter of a degree. If an individual, through carelessness or disregard, commits or omits to perform a certain act or duty upon or directed towards another, he is said to be negligent. When the negligence arises out of a relationship between a layman and a

---

[4] We begin our analysis of the district court's dismissal of three of the Eldridges' causes of action by questioning whether the word "subsumed" is the correct word to describe the effect passage of the Medical Malpractice Act had on Idaho's existing common law causes of action. It appears that what the defendants contended is that the Medical Malpractice Act *supplanted* the common law causes of action. ("Supplant" is defined as to supersede and replace. *Supplant*, Merriam-Webster's Collegiate Dictionary 1255 (11th ed. 2007)). As a result, we will use "supplanted" instead of "subsumed."

professional and is directly attributable to the professional care, treatment, advice, representation, services, or conduct, negligence is by verbal alchemy transmuted into malpractice.

While the area of medical malpractice is complicated, there is nothing in the Act that suggests the common law causes of action that predated passage would be eliminated. What is clear is that the legislature intended to require causes of action based on *negligence* to be proved in a certain way. However, there is nothing in the act itself to suggest various causes of action were being eliminated or merged into a single cause of action for malpractice.

1. The district court erred in dismissing the Eldridges' claim for intentional infliction of emotional distress.

The Eldridges argue that the district court erred when it granted the motion to dismiss brought by West, Turpin, and Summit for the claims of intentional infliction of emotional distress. West, Turpin, and Summit responded that Idaho Code section 6-1012 has supplanted intentional infliction of emotional distress as a cause of action in a medical malpractice case. Consequently, they urge affirmation of the district court's dismissal.

As noted previously, the underlying statute deals with medical malpractice, which is closely related to negligence. In comparison, intentional infliction of emotional distress is substantively different from negligence. Under Idaho law

> four elements are necessary to establish a claim of intentional infliction of emotional distress: (1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe.

*Edmondson v. Shearer Lumber Prods.*, 139 Idaho 172, 179, 75 P.3d 733, 740 (2003) (citation omitted). In addition, to recover damages for emotional distress, Idaho law "clearly requires that emotional distress be accompanied by physical injury or physical manifestations of injury." *Brown v. Matthews Mortuary, Inc.*, 118 Idaho 830, 835, 801 P.2d 37, 42 (1990) (citation omitted).

Whatever else can be said about Idaho Code section 6-1012, it only applies to claims that sound in negligence. The statute requires proof "that such a defendant then and there *negligently* failed to meet the applicable standard of health care . . . ." I.C. § 6-1012 (italics added). The elements of a cause of action for intentional infliction of emotional distress are significantly different from a case of ordinary negligence. For example, it requires proof that the conduct was

"intentional or reckless" and "extreme and outrageous . . . ." *Edmondson*, 139 Idaho at 179, 75 P.3d at 740. We do not read Title 6, Chapter 10 of the Idaho Code as doing away with or affecting intentional causes of action. To the extent our prior decisions suggest otherwise, they are in error and are disavowed. Accordingly, the district court erred in dismissing the Eldridges' claim for intentional infliction of emotional distress pursuant to Rule 12(b)(6).

      2.  <u>The district court erred in dismissing the Eldridges' claims for negligent infliction of emotional distress, gross negligence, and reckless, willful, and wanton conduct.</u>

There is nothing in the plain language of the statute that would indicate that the Medical Malpractice Act supplanted all common law causes of action associated with a provision of or failure to provide health care. In fact, our case law suggests that a plaintiff can assert claims independent from a medical malpractice claim; however, those claims may still fall within the scope of the Medical Malpractice proof requirements.

Idaho Code section 6-1012 states:

> In any case, claim or action for damages due to injury to or death of any person, brought against any physician and surgeon or other provider of health care, . . . such claimant or plaintiff must, as an essential part of his or her case in chief, affirmatively prove by direct expert testimony . . . that such defendant then and there negligently failed to meet the applicable standard of health care practice of the community . . . .

The statute also states that the statute applies to damages for injuries that occurred on "account of the provision of or failure to provide health care or on account of any matter incidental or related thereto[.]" *Id.*

For example, in *Hough v. Fry*, 131 Idaho 230, 233, 953 P.2d 980, 983 (1998), this Court addressed whether Idaho Code section 6-1012 applied to a claim of ordinary negligence. Tellingly, this Court never held that "ordinary negligence" was supplanted by the Medical Malpractice Act. Instead, this Court held that in order for the plaintiff's ordinary negligence claim to survive the motion for summary judgment, the plaintiff must include expert testimony. *Id.* In so holding, the Court stated that to determine if Idaho Code section 6-1012 applies, "courts need only look to see if the injury occurred on account of the provision of or failure to provide health care." *Id.* Further, this Court rejected the notion that every time a provider of medical care is sued Idaho Code section 6-1012 applies. *Id.* Rather, this Court stated that it could "conceive of circumstances where the alleged act of negligence is so far removed or unrelated to the provision of medical care that § 6–1012 would not apply." *Id.*

Based on our case law and the plain language of the statute, the Medical Malpractice Act does not categorically supplant all common law causes of action. Instead, the analysis should be whether the cause of action alleges damages that arise out of the "account of the provision of or failure to provide health care." *See id*. If so, the plaintiff must comply with the expert testimony requirements stated in Idaho Code sections 6-1012 and 6-1013. To the extent that this Court's prior decisions suggest that the Medical Malpractice Act supplants a claim categorically, we disavow them.

Accordingly, the district court erred when it dismissed the Eldridges' common law claims for negligent infliction of emotional distress, gross negligence, reckless, and willful and wanton conduct on the basis that the claims were supplanted by the Medical Malpractice Act. This is not to say that the Eldridges are entitled to a trial on the merits for their various causes of action. Rather, the district court erred in dismissing the claims pursuant to a Rule 12(b)(6) motion.

**B.** **The district court erred in refusing to strike portions of West's first affidavit and Turpin's affidavit because they are conclusory.**

The Eldridges moved to strike paragraphs 3 through 6 of both West's first affidavit and Turpin's affidavit. The district court denied the Eldridges' motion to strike the affidavits, finding that the years of practice in the relevant community were sufficient under *Mattox v. Life Care Centers of America, Inc.*, 157 Idaho 468, 474, 337 P.3d 627, 633 (2014), and that their statements regarding the standard of care complied with *Foster v. Traul*, 141 Idaho 890, 120 P.3d 278 (2005). The Eldridges filed a motion for reconsideration, which the district court also denied. The district court later relied on these affidavits to grant summary judgment to Turpin and partial summary judgment to West.

A statement is conclusory if it does not contain supporting evidence for its assertion. *See Dulaney*, 137 Idaho at 164, 45 P.3d at 820. In reading the two affidavits of West and Turpin, it is clear that paragraphs 4, 5, and 6 in each are conclusory. West's first affidavit stated, in relevant part,

> 4. I provided care and treatment for Mr. Eldridge's right hip from 2009 through 2013. The care and treatment that I provided Mr. Eldridge from 2009 through 2013 complied with the local community standard of care applicable to an orthopedic physician practicing in Idaho Falls, Idaho.
>
> 5. In providing care and treatment for Mr. Eldridge's right hip, there is nothing I did or allegedly failed to do that caused the damages alleged in the Eldridges' Complaint.

6. The opinions which I have expressed in this affidavit are opinions which I actually hold and opinions which I hold to a reasonable degree of medical certainty.

Similarly, Turpin's almost identical affidavit stated,

4. I provided care and treatment for Mr. Eldridge's right hip in 2011 and 2012. The care and treatment that I provided Mr. Eldridge in 2011 and 2012 complied with the local community standard of care applicable to a physician assistant practicing in Idaho Falls, Idaho.

5. In providing care and treatment for Mr. Eldridge's right hip, there is nothing I did or allegedly failed to do that caused the damages alleged in the Eldridges' Complaint.

6. The opinions which I have expressed in this affidavit are opinions which I actually hold and opinions which I hold to a reasonable degree of medical certainty.

In *Mattox*, we held that "[t]he admissibility of expert testimony, however, is a threshold matter that is distinct from whether the testimony raises genuine issues of material fact sufficient to preclude summary judgment." *Mattox*, 157 Idaho at 473, 337 P.3d at 632 (citation omitted). In *Mattox*, we further noted,

the requirements of I.R.C.P. 56(e) apply to expert medical testimony submitted *in connection* with a motion for summary judgment. The party offering an affidavit must show that the facts set forth therein are admissible, that the witness is competent to testify regarding the subject of the testimony, and the testimony is based on personal knowledge. *Statements that are conclusory or speculative do not satisfy either the requirement of admissibility or competency under Rule 56(e).*

*Id*. (italics added) (internal citations and quotation marks omitted).

The rationale and legal reasoning expressed in *Mattox* comport with Rule 56(e) (now Rule 56(c)(4)). In *Mattox*, we held that the requirements contained in 56(e) apply to expert testimony "*submitted in connection* with a motion for summary judgment." *Mattox*, 157 Idaho at 473, 337 P.3d at 632 (italics added) (citation omitted). We did not distinguish between moving and non-moving parties. This would require a defendant to, at a minimum, include an identification of the standard of care applicable to the behavior in question. *Id.* at 472 n.1, 337 P.3d at 631 n.1. In addition, and more to the point, the testimony may not be conclusory. The affidavits of West and Turpin are undoubtedly conclusory. There is nothing in either that explains the basis for the conclusions: "In providing care and treatment for Mr. Eldridge's right hip, there is nothing I did or allegedly failed to do that caused the damages alleged in the

11

Eldridges' complaint." There is no distinction between the affidavits because their statements are identical. More importantly, there is nothing provided to explain these conclusions.

The district court abused its discretion because it failed to apply the correct legal standard for the admission of affidavits regarding a medical malpractice claim as set out in *Mattox*. The district court primarily relied on *Foster* to find the affidavits, despite containing conclusory language, were admissible. In this regard, the district court erred. *Foster* did not concern admissibility; rather, it only dealt with the level of evidence required of a moving party in order to shift the burden during a motion for summary judgment. *Foster*, 141 Idaho at 893, 120 P.3d at 281. The district court should have stricken the inadmissible conclusory paragraphs from the affidavits.

    1.  <u>Orders of summary judgment affected by this decision.</u>

The district court relied on West's first affidavit to grant summary judgment in favor of West concerning the Eldridges' claim that West breached the standard of care by failing to remove Phillip's hip on October 29, 2012. The district court wrote,

> [i]n his first affidavit Dr. West established that he was an experienced board certified orthopedic surgeon practicing in Idaho Falls for many years before and after October 29, 2012, familiar with the Idaho Falls standard of care for replacing hips and treating patients with symptoms of pain from infectious diseases. He opinioned that his surgery on October 29, 2012 met the Idaho Falls standard of care in not doing a full explant of both sections of Eldridge's hip.

Reliance on a conclusory affidavit requires vacating the order granting summary judgment. *See Mattox*, 157 Idaho at 473, 337 P.3d at 632. Consequently, the order granting summary judgment in favor of West regarding a breach of the standard of care by failing to remove Phillip's hip on October 29, 2012, is vacated.

However, several orders granting summary judgment will be affirmed. First, the district court also granted West summary judgment on the Eldridges' informed consent claim. The district court concluded that the Eldridges did not establish a genuine issue of material fact supporting the proximate cause element of informed consent. There is nothing in the Eldridges' briefing concerning informed consent. Accordingly, we do not disturb the district court's order granting summary judgment on the Eldridges' informed consent claim.

Second, although Turpin's affidavit was conclusory, the order granting Turpin summary judgment is also affirmed. Here, Turpin argued in his motion for summary judgment that the Eldridges could not establish their medical malpractice claim against him because they did not

12

have direct expert testimony that Turpin had breached the relevant standard of care as required by section 6-1012. The district court found that Giordani's declaration failed to set forth a foundation that established that he had actual knowledge of the standard of care for a *physician's assistant* in Idaho Falls. Based on the district court's decision that Giordani's declaration lacked foundation, the district court concluded that the Eldridges failed to produce admissible evidence that Turpin had breached the standard of care. If a plaintiff in a medical malpractice action fails to provide expert testimony evidence that the defendant negligently failed to meet the applicable standard of health care, the medical defendant is entitled to summary judgment. *Mattox*, 157 Idaho at 473, 337 P.3d at 632 (citation omitted).

Notably, the Eldridges failed to assert in their opening brief that the district court erred when it struck portions of Giordani's declaration as it related to Turpin. This Court will not consider an issue not "supported by argument and authority in the *opening* brief." *Bach v. Bagley*, 148 Idaho 784, 790, 229 P.3d 1146, 1152 (2010) (italics added) (citation omitted). Despite attempting to dispute the declaration in their reply brief, the issue is waived. *Suitts v. Nix*, 141 Idaho 706, 708, 117 P.3d 120, 122 (2005) (citation omitted) ("[T]his Court will not consider arguments raised for the first time in the appellant's reply brief.").

## C. The district court abused its discretion in precluding the Eldridges from putting on proof of damages that arose after April 24, 2013.

The specific issue arises from the following statement of the district court:

[A]s near as I can tell in my review of the record in this case, including the report and declarations and affidavits of Dr. Giordani, he really never even looked at any medical records after April 24, 2013, dealing with Mr. Eldridge. So therefore the court doesn't think he has enough foundation to give an opinion as to whether or not there was necessary or unnecessary surgery after that date.

The district court's conclusion is not supported by substantial and competent evidence. Giordani's reports clearly indicate that he reviewed documents from South Davis Community Hospital, the University of Utah, and Dr. Altenburg. The care provided to Phillip at each of these institutions and by this physician all occurred *after* April 24, 2013. Consequently, it is not possible to understand how the district court reached its conclusion. In addition, Giordani rendered his opinion that "[h]ad Dr. West performed a full explant on October 29, 2012, [the explant] . . . would have avoided the subsequent surgeries Mr. Eldridge endured in this case." Not only was Giordani familiar with the records, his ultimate opinion directly links the

13

sequelae Eldridge sustained as resulting from West's failure to perform the explant on October 29, 2012.

Based on the exclusion of Giordani's expert testimony, the district court concluded that there was no issue of material fact regarding damages after April 24, 2013. The district court's ruling limiting the Eldridges' damages to April 24, 2013, was an abuse of discretion. Accordingly, we reverse the summary judgment granted in West and Summit's favor in this regard.

**D.      The district court erred in limiting the Eldridges' presentation of damages.**

Idaho Code section 6-1606 prohibits double recoveries from collateral sources. That statute provides,

> a judgment may be entered for the claimant only for damages which exceed amounts received by the claimant from collateral sources as compensation for the personal injury or property damage[.] . . . For the purposes of this section, collateral sources shall not include benefits paid under federal programs . . . . Evidence of payment by collateral sources is admissible to the court after the finder of fact has rendered an award.

I.C. § 6-1606.

West and Summit filed a motion in limine to restrict the jury's consideration to only the amount of damages the Eldridges incurred after the Medicare write-offs had been applied, rather than the amount actually invoiced by the care providers. The district court granted the motion in limine. On appeal, the Eldridges contend the district court failed to apply *Dyet v. McKinley*, 139 Idaho 526, 81 P.3d 1236 (2003). In addition, they argue that public policy should dictate that the invoiced amounts be presented to the jury, rather than the amounts after the Medicare write-offs were applied. West and Summit argue that the district court correctly applied *Dyet* and that public policy favors presenting the jury with only the amount that was actually paid by the Eldridges.

In *Dyet*, this Court held that Medicare write-offs are not technically collateral sources under section 6-1606. 139 Idaho at 529, 81 P.3d at 1239. Nevertheless, this Court went on to hold that although Medicare write-offs are technically not a collateral source "it is the type of windfall that I.C. section 6-1606 was designed to prevent." *Id.* Notably, the question answered in *Dyet* was not whether the jury should be precluded from considering the amount actually

14

invoiced by the care provider; rather, the question was whether the judgment entered by the court should be reduced by the amount of the Medicare write-offs.[5] *Id.*

In *Dyet*, this Court found that the judgment entered should be reduced by the write-offs. *Id.* The plain language of the statute suggests a similar approach here. The statute provides: "Evidence of payment by collateral sources is admissible to the court *after the finder of fact has rendered an award*. Such award shall be reduced by the court to the extent the award includes compensation for damages, which have been compensated independently from collateral sources." I.C. § 6-1606 (italics added). Consequently, the district court erred in granting the motion in limine. The jury should be provided with the providers' bills that are subject to the write-offs, absent any write-offs. If a verdict is rendered that includes those amounts, "[s]uch award shall be reduced by the court." *Id.* However, it is only possible to give effect to the statute by submitting the bills as they exist, prior to the write-offs, to the factfinder. Consequently, the district court erred in concluding that the Medicare write-offs should be subtracted from the invoices prior to their submission to the jury.

### E. No party is entitled to attorney fees or costs.

The Eldridges request an award of attorney fees under Idaho Code section 12-121. They also seek their costs under Rule 40 of the Idaho Appellate Rules. Our case law precludes an award of attorney fees in an interlocutory appeal under Idaho Code section 12-121. In *Terra-West, Inc. v. Idaho Mutual Trust, LLC*, 150 Idaho 393, 401, 247 P.3d 620, 628 (2010), we held:

---

[5] When a health-care provider agrees to treat Medicare patients, the health-care provider sends a claim for services to Medicare or a Medicare Administrative Contractor (MAC). *See* Michael W. Cromwell, *Cutting the Fat Out of Health-Care Costs: Why Medicare and Medicaid Write-Offs Should Not Be Recoverable Under Oklahoma's Collateral Source Rule*, 62 OKLA. L. REV. 585, 588 (2010). This billed amount is often referred to as the "claim amount." However, Medicare will only pay a fraction of the claim amount. The portion of the bill that Medicare will pay is referred to as a "Medicare-allowed amount." The difference between the "Medicare-allowed amount" and the "claimed amount" is written off as a loss by the health-care provider by operation of federal law. *See* 42 U.S.C. § 1395cc(a)(1)–(2); 42 C.F.R. § 489.21(a).

The determination of the Medicare-allowed amount (and by consequence, the write-off amount) is generally determined by contracts and fee schedules. When a health-care provider agrees to become a participating provider, it agrees to accept the "Medicare-allowed amounts" as payment in full. Ctrs. for Medicare & Medicaid Servs., *Medicare Provider Enrollment*, https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/EnrollmentResources/provider-resources/Med-Prov-Enroll-MLN9658742.html (last visited Feb. 13, 2020). Medicare determines its allowed amounts based on the type of care provided and the geographical location of the health-care provider. An oversimplified explanation of the procedure is as follows: Medicare or the MAC will assign a value to the services provided through a use of certain value systems and weighting factors. *See generally* Ctrs. for Medicare & Medicaid Servs., *Fee Schedules – General Information*, https://www.cms.gov/medicare/medicare-fee-for-service-payment/feescheduleginfo/index.html (last visited Feb. 13, 2020). Then, allowed amounts are adjusted according to geographic location. *Id.*

"[W]here the appeal is interlocutory in nature and the action will be remanded for further proceedings, neither party is the prevailing party on appeal." *Doe v. Boy Scouts of Am.*, 148 Idaho 427, 431, 224 P.3d 494, 498 (2009). Because we do not yet know who will ultimately prevail in this action any determination of the prevailing party is premature. *City of McCall v. Buxton*, 146 Idaho 656, 667, 201 P.3d 629, 640 (2009).

Consequently, because this matter involves a permissive appeal that is being remanded for further proceedings, it is not possible to determine which party will ultimately prevail. As a result, the Eldridges' request for attorney fees under Idaho Code 12-121 is denied.

Further, as multiple adverse parties have prevailed in part on appeal, there is no "prevailing" party. Accordingly, we decline to award costs to any party.

## IV. CONCLUSION

For the reasons stated, we reverse and vacate the district court's decisions and remand this case for further proceedings consistent with this decision. However, the orders granting summary judgment to West regarding the Eldridges' informed consent claim and Turpin are affirmed. We also decline to award attorney fees and costs.

Chief Justice BURDICK, Justices BRODY, BEVAN and MOELLER CONCUR.